988 P.2d 148

Antone Lee TOBEL and Judy Tobel, Plaintiffs–Appellants,

v.

TRAVELERS INSURANCE COMPANY, a Connecticut corporation, Defendant–Appellee.

No. 1 CA–CV 98–0212.

Court of Appeals of Arizona, Division 1, Department D.

March 30, 1999.

Review Denied Oct. 26, 1999.

Charles M. Brewer, Ltd. By Charles M. Brewer, Luis P. Guerra, John B. Brewer, Phoenix, Attorneys for Plaintiffs–Appellants.

Teilborg, Sanders & Parks, P.C. By John C. Gemmill, David E. Koval, Phoenix, Attorneys for Defendant–Appellee.

## AMENDED OPINION

WEISBERG, Presiding Judge.

¶ 1 Appellants, Antone Lee Tobel and Judy Tobel ("Tobel"), appeal from the trial court's judgment, based on cross-motions for summary judgment, in favor of appellee, Travelers Insurance Company ("Travelers"). The trial court determined that Tobel was not entitled to underinsured motorist coverage ("UIM") under a policy issued by Travelers to Tobel's employer, Barricade Light & Rental, Inc. ("Barricade"), because Tobel was not an insured under the terms of the policy. The court therefore granted Travelers's cross-motion for summary judgment on that issue as well as its motion for summary judgment on Tobel's claims of breach of contract, bad faith, and breach of the covenant of good faith and fair dealing under the policy. The court also denied Tobel's motion to amend its complaint to include a claim for spoliation of evidence. Because we find that the trial court erred as a matter of law in finding that Tobel was not entitled to UIM coverage under the policy, we reverse summary judgment on that issue.

## FACTS AND PROCEDURAL HISTORY

¶ 2 We view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to Tobel, the party against whom summary judgment was granted. *Angus Med. Co. v. Digital Equip. Corp.*, 173 Ariz. 159, 162, 840 P.2d 1024, 1027 (App. 1992).

¶ 3 The UIM insurance claim arises out of an accident that occurred on June 3, 1993. At approximately 7:00 a.m. on that date, Tobel, who was working for Barricade as a

driver and barricade setter, was dispatched by his employer to an emergency situation at the site where the Mill Avenue overpass crosses the Superstition Highway (U.S.60). The night before, following an accident, Department of Public Safety officers and Tempe Police officers had commandeered barricades belonging to Tobel's employer that were being stored on the east sidewalk of Mill Avenue to assist them in closing the westbound U.S. 60 Mill Avenue on-ramp and left-turn lane of northbound Mill Avenue. They apparently left the barricades in the street when they were finished.[1] Tobel was dispatched to the area to remove the barricades because they were impeding heavy rush-hour traffic.

¶ 4  It is not disputed that Tobel drove to the location in a company truck permanently assigned to him and insured under a commercial vehicle policy issued to Barricade by Travelers. The truck was a white Isuzu one-ton flat-bed truck, marked with the company's markings and equipped with flashing lights over the cab, four-way emergency flashers, and a two-way radio connected to the company's dispatcher. According to Tobel, the truck was also fully stocked with repair and emergency equipment for lane closures.

¶ 5  Tobel drove to the location on U.S. 60 to the eastbound exit leading to Mill Avenue. When he reached the traffic light on Mill Avenue at the top of the eastbound exit ramp from U.S. 60, he noticed several of the company's barricades blocking the rush-hour traffic on the Mill Avenue overpass.

¶ 6  Tobel evaluated the situation and activated the truck's overhead flashing lights and four-way emergency flashers to alert traffic that he was going to be working on the overpass. He turned left onto Mill Avenue and drove the truck onto the overpass, using the truck to knock over one of the barricades so that he could maneuver himself and the truck into the area blocked off by the remaining barricades. Tobel then re-

checked both the overhead flashers and four-way flashers on the truck to be sure they were working, as he would be working outside the truck and needed to ensure that motorists were alerted to his presence. Tobel also wore an orange warning vest. Tobel's intention was to use the truck to provide safety and as a base of operations as he attempted to remove the six or so barricades from the traffic lanes.

¶ 7  Tobel picked up two barricades and tried to place them in the median strip, but they would not fit and appeared to him to create a potential hazard. He therefore decided to carry the barricades to a storage place on the east sidewalk of the Mill Avenue overpass. In order to do so, Tobel walked between two cars stopped in the northbound lane, the traffic lane immediately outside the barricaded lane. He stopped between the two cars and looked out before stepping out into the curb lane. He saw that the lane was clear and stepped into it when a car came "out of nowhere" and struck him. At the time he was hit, Tobel estimates that he was ten to twelve feet from his truck.[2]

¶ 8  As a result of this accident, Tobel sustained severe and permanent injuries, including fragmentation of the pelvis; dislocation and fragmentation of the acetabulum [3]; and complex fractures to his right hip, which required surgical reduction and internal fixation procedures, and, finally, total hip replacement in 1994. As a result of these injuries, Tobel has sustained a twenty-five percent permanent impairment. His medical bills approximate $128,968.41, and his lost income exceeds $15,000.00.

¶ 9  The insurance carrier of the car that hit Tobel paid $30,000.00, the limits of the driver's insurance policy. Because that amount did not compensate Tobel for his entire loss, he sought additional compensation from his employer's UIM policy with Travelers. After Travelers refused coverage, Tobel filed a complaint on November 12, 1996, alleging bad faith, breach of the insur-

---

**1.** For related facts, see also *Tobel v. State Dep't of Pub. Safety,* 189 Ariz. 168, 170, 939 P.2d 801, 803 (App.1997).

**2.** There are differing estimates of the distance in the record, ranging from ten to twelve feet, to sixteen to seventeen feet.

**3.** This is the cup-shaped socket in the hip-bone.

ance contract, breach of the covenant of good faith and fair dealing, and asking for a declaratory order establishing the parties' rights under the policy.

¶ 10  On October 1, 1997, Tobel filed a motion for partial summary judgment on the issue of entitlement to UIM coverage only. Travelers responded and filed a cross-motion for summary judgment, maintaining that Tobel was not entitled to coverage as he was neither "using" nor "occupying" the covered vehicle at the time of the accident. Tobel also filed a motion to amend his complaint to add a claim of spoliation of evidence based on his discovery that Travelers had purged its files and destroyed the relevant underwriting file.

¶ 11  The trial court granted Travelers summary judgment on the coverage claim. It consequently granted Travelers' oral motions for summary judgment on Tobel's contract-related claims as well. In addition, the court denied Tobel's motion to amend his complaint to add a claim for spoliation of evidence, finding that "spoliation of evidence has not been recognized in Arizona as a separate tort." Tobel timely appealed.

¶ 12  We have jurisdiction pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 12–2102(B).

## DISCUSSION

■ ¶ 13  Summary judgment is appropriate where no material facts are in dispute and where the moving party is entitled to judgment as a matter of law. *Colonial Tri-City Ltd. Partnership v. Ben Franklin Stores, Inc.*, 179 Ariz. 428, 432, 880 P.2d 648, 652 (App.1993). This Court reviews *de novo* whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *Gonzalez v. Satrustegui*, 178 Ariz. 92, 97, 870 P.2d 1188, 1193 (App.1993). In this case, judgment turns on the interpretation of an insurance contract, a matter of law that we review *de novo*. *American States Ins. Co. v. C & G Contracting, Inc.*, 186 Ariz. 421, 423, 924 P.2d 111, 113 (App.1996).

¶ 14  It appears from the record that there is no genuine factual dispute about what transpired from the time Tobel received the call dispatching him to the location of the accident to the time he was struck by the car. It is also not disputed that the company truck is a covered vehicle under the policy and that, at the time of injury, Tobel was engaged in activities within the course and scope of his employment. What is disputed is whether Tobel falls within the class of persons entitled to UIM coverage under the terms of the policy.

¶ 15  Tobel's arguments are based on two alternative theories, both of which are contested by Travelers. First, Tobel argues that he was "occupying" the truck at the time of injury and is therefore entitled to coverage under the UIM provision of the policy pursuant to our decision in *Manning v. Summit Home Insurance Co.*, 128 Ariz. 79, 623 P.2d 1235 (App.1980). Alternatively, Tobel argues that, as a permissive user of the truck, he is entitled to coverage under the general liability provisions of the policy.

¶ 16  The trial court concluded that Tobel was not "occupying" the truck because he was not "getting in or out of it" at the time of injury, and therefore distinguished this case from our holding in *Manning*. It also found that Tobel was not an "insured" but an "anyone else" under the policy's coverage provisions and therefore held that Tobel was not entitled to UIM coverage because such coverage was "not 'portable.'" In reaching this conclusion, the court relied on *American States* and *Farmers Insurance Company of Arizona v. United States Fidelity and Guaranty Co.*, 185 Ariz. 125, 912 P.2d 1354 (App. 1995). We conclude, however, that, as a permissive user of the truck, Tobel was covered under the policy's general liability provisions for employees.

## I.  Was Tobel an Insured Under the Policy's Liability Coverage?

¶ 17  The general liability provisions of the policy provide in relevant part as follows:

A.  COVERAGE

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident"

and resulting from the ownership maintenance or use of a covered "auto."

. . .

1. WHO IS AN INSURED

. . .

    a.  You for any covered "auto."

    b.  Anyone else while using with your permission a covered "auto" you own

. . .

¶ 18  Travelers argues that Tobel is not an insured under the terms of these provisions because he was not "using" the flat-bed truck at the time of his injury. Travelers notes that, at the time he was hit, Tobel "was not driving the truck, nor . . . loading barricades on it," he was "moving barricades from middle of the road to the . . . sidewalk." Thus, Travelers reasons, "[t]he fact that the truck was parked a couple of lanes away with its lights and radio on was incidental to Tobel's location and work at the time of the accident" and does not constitute a use "in any meaningful sense which would support a finding of coverage under an auto policy."

¶ 19  In support of this argument, Travelers cites *Mullins v. Mayflower Insurance Co.*, 9 Cal.App.4th 416, 11 Cal.Rptr.2d 635 (1992). In that case, the mother of a teen-aged passenger who was killed while walking away from a disabled car to find a telephone sought coverage under the driver's general liability provision. *Id.* at 636. The mother argued that when the use and operation of a motor vehicle place the person who is injured at risk, the person remains covered until reaching safety. *Id.* at 637. The California Court of Appeals considered both the teenager's proximity to the car and his intent with respect to it. *Id.* at 638. It concluded that the teenager was not covered because he had temporarily abandoned the car and was not performing an act " 'physically and directly related to the car' " when injured and was, therefore, not "using" it at the time. *Id.*

¶ 20  We, however, do not find the reasoning in *Mullins* dispositive in this case. Instead, we focus on two critical factors that Travelers ignores: the nature of the business in which Barricade was engaged and the specialized nature and function of the vehicle involved.

¶ 21  As its name reflects, Barricade is in the business of supplying barricades employed at construction or other work sites to restrict or direct the flow of motor vehicle traffic. The insured vehicle is a one ton, flatbed truck used to transport those barricades to or from locations, where they are emplaced to control the flow of traffic. The truck is equipped with a two-way radio that connects the driver to the company dispatcher and permits the company to relay work orders and assignments.

¶ 22  A driver's job involves not only driving the barricades to a particular location but also setting them out and retrieving them. Consequently, a driver's job requires his working outside the truck itself, either picking up barricades or emplacing them at various spots near the truck. Because of the hazards involved in moving the barricades about in traffic, the truck is equipped with overhead emergency flashers as well as four-way flashers to alert surrounding motorists to an unusual situation in the roadway and to provide a measure of safety to the driver. Given the nature of Barricade's business, "use" of the flat-bed truck envisions its employment in providing a source of protection for the driver while he is outside the truck at a work site. The flat-bed truck is adapted to the particular needs of the business and the nature of the work involved, and on the day of the accident, Tobel was "using" it in a fashion that is in keeping with its intended use as a warning device.

¶ 23  Cases from other jurisdictions that have dealt with insurance claims involving specialized vehicles have recognized that the "use" of such vehicles encompasses activities that may be outside the scope of those normally associated with the use of passenger vehicles. Those courts have concluded, as do we, that activities that constitute "use" of a specialized vehicle include its employment for functions that are reasonably dictated by the nature of the work in which the business is engaged and for which the vehicle in question has been equipped and may be reasonably expected to be used.

¶ 24  For example, in *Monroe Guaranty Insurance Co. v. Campos,* 582 N.E.2d 865, 870 (Ind.App.1991), the Indiana Court of Ap-

peals considered the nature of a towing business and reasoned that the "use" of a tow truck required a tow truck driver to exit the vehicle, evaluate the tow scene, secure the tow car, and confer with appropriate officials at the tow scene concerning safety procedures. Thus, it held that a tow truck driver who was injured in exiting a police car after conferring with the officers about safety procedures for removing a tractor-trailer truck he was about to tow was "using" the tow truck at the time of injury. *Id.* at 866, 871. The court noted that, because the insurance contract provided coverage for a towing company and employees engaged in towing operations, the parties necessarily would have contemplated the nature of these business activities. *Id.* at 870.

¶ 25 Similarly, in *Great American Insurance Co. v. Cassell,* 239 Va. 421, 389 S.E.2d 476, 477 (1990), the Supreme Court of Virginia considered whether a fire fighter who was struck and killed at the scene of a car fire, while standing twenty to twenty-five feet from his fire engine and while completing a report, was "using" the fire truck at the time. The court reasoned that the "use" of a fire truck included its use in pumping the water stored on the truck to extinguish the car fire; transporting equipment to be used by the fire fighters at the scene; and "creating a barrier to control traffic and protect the fire fighters" at the scene. *Id.* at 477. The court concluded that "use of the truck to extinguish the fire, control traffic, and protect the fire fighters ... was an integral part of the fire fighters' mission." *Id.*

¶ 26 In *Oberkramer v. Reliance Insurance Co.,* 650 S.W.2d 300, 302 (Mo.App.1983), the Missouri Court of Appeals noted that "use" of a police car as a barricade for a road block, while not common, was "neither unusual nor unexpected for a police officer." The court therefore concluded that the officer's "temporary physical separation" from the car did not destroy the officer's use of it but rather "established his actual use of the vehicle for a particular police purpose—a road block." *Id.* at 302–03.

¶ 27 Recently, the Colorado Supreme Court considered a case with facts almost directly parallel to those here. *Aetna Casu-*

*alty and Surety Co. v. McMichael,* 906 P.2d 92 (Colo.1995). McMichael was the employee of a construction company who had been dispatched to saw concrete joints in the median of a divided highway. *Id.* at 94. Once McMichael reached the work site, he parked the truck and left it running, turned on the overhead beacon and emergency flashers, and began his work. *Id.* While he was in the process of working "some distance in front of the truck," a car approaching from the opposite direction swerved into the median and struck him. *Id.*

¶ 28 In order to determine whether McMichael was entitled to recover for his injuries under the UIM provisions the company's policy, the court was required to resolve the question of whether McMichael was "using" his truck at the time of the accident. *Id.* at 96. The court held that the fact that "[t]he truck was modified with warning devices suggest[ed] that the truck was intended to be used as a protective device." *Id.* Furthermore, given the named insurer's involvement in construction activities, the court found that the truck's use "for warning purposes ... was both conceivable and foreseeable at the time the parties entered the insurance contract." *Id.* Thus the court concluded that McMichael had been using the truck "in a manner not foreign to its inherent purpose at the time of the accident." *Id.*

¶ 29 Along the same lines, in *Randall v. Liberty Mutual Insurance Co.,* 255 Va. 62, 496 S.E.2d 54 (1998), the Supreme Court of Virginia found that an employee of a construction company who was struck and killed by a motorist while placing lane closure signs on the shoulder of a highway was "using" his truck when injured and thus was insured for UM/UIM purposes under his employer's vehicle policy. The vehicle in *Randall* was a pickup truck equipped with a "flashing yellow bubble light on top of the cab," which the employee had activated while working. *Id.* at 55. In so doing, the employee had been following company procedures. *Id.* at 57. According to a co-worker, the employee was approximately six to ten feet behind the truck on the side of the road at the moment he was hit. *Id.* at 55.

¶ 30 The insurance company in *Randall* argued that the employee had not been using his truck at the time he was killed, that the vehicle was an ordinary pickup intended simply to transport items to be deposited at a work site, and that the use of the yellow light was simply to protect the truck by showing the truck's location. *Id.* at 56. The court did not agree. It found that "the specialized warning equipment and its relationship to [the employee's] work made the use of the truck more than merely a means of transportation." *Id.* It thus concluded that, at the time he was struck, the employee had been "using the truck's specialized equipment to perform his mission" and that coverage was mandated. *Id.* at 57.

■ ¶ 31 We find the reasoning of these cases [4] persuasive. The fact that the truck is equipped with specialized safety equipment signifies that it was intended to be used as more than a means of transportation. It signifies that it was also intended to be used as a safety device for barricade workers working in dangerous traffic conditions. Tobel was thus "using" the flat-bed truck in a manner consistent with its purpose when he used its safety equipment to provide him with protection while performing his mission of redepositing the barricades.

¶ 32 Travelers provided a commercial insurance policy to a barricade company. Travelers has not argued that it did not know the type of work that Barricade did or the type of activities for which the flat-bed truck would be used. In fact, it acknowledges that the truck was used to transport barricades to sites where they were to be loaded or unloaded, which would require activity outside the truck itself and presumably be the reason the truck was outfitted with emergency lights and flashers. Therefore, it was reasonable to expect that the use of the truck as a warning/protective device was an integral part of the truck's mission in Barricade's work. We therefore conclude that, at the time he was

injured, Tobel was using the flat-bed truck, with its emergency lights, for its intended use of warning motorists of his presence and providing him with protection while he worked in its proximity.

## II. Was There a Causal Nexus Between the Use of the Truck and Tobel's Injuries?

■ ¶ 33 Travelers also argues that the general liability provisions do not entitle Tobel to coverage because there is no causal connection between his use of the truck and his injuries. Travelers maintains that, even if Tobel had been "using" the truck at the time of the accident, in order for coverage to result there must be evidence that the accident "arose out of" or "resulted from" the use of the truck. As support, Travelers cites cases in which courts have found that no causal link exists to trigger recovery for liability resulting from "ownership, maintenance or use" of a covered vehicle when the vehicle is merely the site of an accident or when the claimant's use does not result from the inherent nature of the vehicle. *See Morari v. Atlantic Mut. Fire Ins. Co.,* 105 Ariz. 537, 468 P.2d 564, (1970); *Benevides v. Arizona Prop. & Cas. Ins. Guar. Fund,* 184 Ariz. 610, 911 P.2d 616 (App.1995); *Love v. Farmers Ins. Group,* 121 Ariz. 71, 588 P.2d 364 (App.1978); *Brenner v. Aetna Ins. Co.,* 8 Ariz.App. 272, 445 P.2d 474 (1968); *Ruiz v. Farmers Ins. of Arizona,* 177 Ariz. 101, 865 P.2d 762 (1993). Thus, Travelers restricts the definition of "inherent use" to providing transportation and argues that the truck simply had "no connection" with the accident. We, however, disagree.

¶ 34 First, we note that the cited cases do not involve the "use" of vehicles that are specially equipped to serve a specific business purpose. Therefore, we find their analyses less than persuasive when analyzing "use" in the context of a specialized vehicle such as the truck in this case. However,

---

4. In a related context, the Supreme Court of Virginia recently found that a student who was struck while crossing a lane of traffic to get onto a school bus while the bus's warning devices were activated was "using" the vehicle and thus entitled to UIM/UM coverage. *Newman v. Erie Ins. Exch.,* 256 Va. 501, 507 S.E.2d 348 (1998).

The court in that case reasoned that the "child use[d] the safety equipment as an integral part of his mission of walking across the street to board the bus." 507 S.E.2d at 352. Here, Tobel used the safety equipment on his truck as an integral part of his mission to relocate the company's barricades.

even these cases concede that a causal nexus can and does exist when an injury may be said to arise out of the inherent use of a vehicle, although not when the use of the vehicle is just incidental to the injury. As our supreme court concluded in *Ruiz*, "[t]he fundamental question is whether the use of the vehicle was itself the cause of the injury." 177 Ariz. at 104, 865 P.2d at 765.

¶ 35   The *McMichael* court addressed the issue of the causal relationship between a covered specialized vehicle and the employee's injuries. 906 P.2d at 103. It held that the causation test did not require that the insured vehicle itself be the source of the injury, but "only that the use be integrally related to the claimant's activities and the injury at the time of the accident." *Id.* The court noted that McMichael was aware of the dangers posed to roadway workers by passing cars, that he had not entered the roadway to work until he had positioned the truck to serve as a notice of his presence, and that he had thus relied on its safety features to protect him from oncoming traffic. *Id.* at 104. The court therefore found that the injuries arose from the use of the truck because the "use of the truck, and particularly its specifically designed safety features, was an integral part of [McMichael's] work on the roadway." *Id.*

¶ 36   Here, Tobel's injuries arose out of his use of a specialized flat-bed truck, which included his use of its emergency lights to serve as a warning of his presence in traffic. Tobel was aware of the dangers of working in the morning rush-hour traffic. When he activated the lights, it was to alert traffic that there was someone working in its vicinity. Therefore, his use of the truck was causally related to the accident and his injuries.

### III.   Is Tobel Entitled to UIM Coverage as a Permissive User?

¶ 37   Tobel argues that, pursuant to *Farmers Insurance Company of Arizona v.*

*United States Fidelity*, as a permissive user of the company's truck, he is insured under the general liability provisions of the policy and, therefore, entitled to UIM coverage. Travelers responds that, because Tobel was not driving the truck at the time of the accident, he was not "using" it. Therefore, Travelers reasons, *Farmers* does not control and Tobel should not be covered for general liability purposes. We, however, agree with Tobel.

¶ 38   As previously noted, the general liability provisions of Travelers's policy with Barricade provide that an insured is "[a]nyone else while using with your permission a covered 'auto' you own." Because we have determined that Tobel was using the truck at the time of his injury, we conclude that he was a covered insured under the general liability provision of the policy.

¶ 39   Travelers also contends that *Farmers* was wrongly decided and that the language of Arizona Revised Statutes Annotated ("A.R.S.") section 20–259.01(A) (1990) "should not have been interpreted to mean that all persons insured for liability purposes must also be insured for UM purposes." However, we agree with the reasoning of *Farmers* and see no reason for revisiting its holding here.[5]

¶ 40   Notwithstanding, we note that, while UIM coverage is at issue here, *Farmers* dealt with UM coverage. We also note that Travelers does not argue that the policy considerations that apply to UIM coverage are any different from those that apply to UM coverage. In *American States*, we commented that the purpose of UIM coverage is to protect the insured from negligent, inadequately insured drivers and that public policy, therefore, precluded an insurer from denying UIM coverage to an insured. 186

---

**5.**  Although the language of A.R.S. section 20–259.01(A) has been changed since the *Farmers* opinion, Tobel maintains that the language discussed in *Farmers* was in effect at the time of his accident. Travelers does not dispute this and has conceded that the language was amended after the date of the subject accident. Travelers, nonetheless, argues that, because that language has since been deleted from the statute, there is

no longer any reason to interpret it to mean that either UIM or UM coverage should be co-extensive with liability coverage. We disagree and observe that the current language of A.R.S. section 20–259.01(B), which specifically deals with underinsured motorist coverage, provides that when underinsured motorist coverage is selected, "[t]he selection of limits ... shall be valid for all insureds under the policy."

Ariz. at 425–26, 924 P.2d at 115–16. Consistent with the reasoning of *Farmers* and *American States,* we find that Tobel is entitled to UIM coverage under the policy because he was a permissive user included under the terms of that policy.

## IV. Did the Trial Court Err in Denying Tobel's Leave to Amend His Complaint to Add a Claim for Spoliation of Evidence?

¶ 41  Tobel's accident occurred on June 3, 1993.  Tobel contacted Travelers's claims department during 1993 and 1994 concerning his UIM coverage claim.  Travelers ultimately denied coverage on February 24, 1995, and on November 12, 1996, Tobel filed his complaint.

¶ 42  On October 1, 1997, in preparing its case, Tobel asked Travelers for a copy of the underwriting file.  According to Tobel, after being told several times that it would be provided, Travelers informed him that the file had been destroyed "sometime after November of 1995."  On December 8, 1997, Tobel then moved to amend his complaint to add a claim for spoliation of evidence.  This motion was denied by the trial court "upon the basis that spoliation of evidence has not been recognized in Arizona as a separate tort."

■ ¶ 43  A decision on a motion to amend a complaint is within the sound discretion of the trial court, and this court will not disturb that decision absent a clear abuse of discretion.  *Bogue v. Better-Bilt Alum. Co.,* 179 Ariz. 22, 34, 875 P.2d 1327, 1339 (App.1994).  Arizona has not recognized a separate tort of spoliation of evidence.  *See La Raia v. Superior Court,* 150 Ariz. 118, 121, 722 P.2d 286, 289 (1986); *Souza v. Fred Carries Contracts, Inc.,* 191 Ariz. 247, 249 n. 1, 955 P.2d 3, 5 n. 1 (App.1997).  Therefore, the trial court did not abuse its discretion in denying leave to amend in this case.[6]

## V.  Bad Faith Claim

¶ 44  Tobel's complaint also alleged a claim for bad faith because of Travelers's failure to provide UIM coverage under the terms of the policy.  On January 29, 1998, the trial court granted Travelers's oral motion for summary judgment on this claim.  Somewhat confusingly, Tobel does not contest the court's grant of summary judgment on the bad faith claim, but asks that, if this court reverses the summary judgment in favor of Travelers, it order discovery on the issue of the breach of the covenant of good faith and fair dealing.  Tobel cites *Rawlings v. Apodaca,* 151 Ariz. 149, 157, 726 P.2d 565, 573 (1986), for the proposition that "the covenant of good faith and fair dealing can be breached even though the company performs its express covenants under the insurance contract."

■ ¶ 45  A bad faith claim cannot exist for claims that are "fairly debatable."  See *Noble v. National Amer. Life Ins. Co.,* 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981).  "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying [the] benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim."  *Id.*  "The tort of bad faith arises when the insurance company intentionally denies, fails to process or pay a claim without a reasonable basis for such action."  *Id.*  But the issue of coverage in this case was "fairly debatable," as borne out by the fact that this court and the trial court reached differing conclusions.

■ ¶ 46  Moreover, Tobel's reliance on *Rawlings* is misplaced.  In *Rawlings,* the insurance company insured both the appellant and an adjoining landowner who had caused damage to appellant's property.  151 Ariz. at 152, 726 P.2d at 568.  Although the insurance company paid the appellant's claim under its insurance policy with appellant, it also, "for its own benefit," intentionally withheld information about its other policy insuring the adjoining landowner.  It did so to impede the appellant's claims against that party.  *Id.* at 157, 726 P.2d at 573.  Under those circumstances, our supreme court found that an action for breach of the covenant of fair dealing could still be pursued even though the insurance company had per-

---

6.  We also note that there was no indication that  Travelers had destroyed the file in bad faith.

formed the express covenants of the appellant's policy because it had "for its own profits ... breached its duty to play fairly with its insureds and to give their legitimate interests equal consideration." *Id.*

¶ 47 Given the dissimilar facts of this case, *Rawlings* is not pertinent. We therefore decline to reverse the trial court on this issue.

## CONCLUSION

¶ 48 For the reasons stated above, we reverse on the UIM coverage issue only and remand for further proceedings consistent with this opinion.

CONCURRING: THOMAS C. KLEINSCHMIDT, Judge, and REBECCA WHITE BERCH, Judge.