CITY OF INDIANAPOLIS, Metropolitan Development Commission and Indiana Sports Corporation, Appellants–Defendants,

v.

Clarke KAHLO and Howard Elder on their own behalf and on behalf of the taxpayers of Marion County–Indianapolis, Appellees–Plaintiffs.

No. 49A05–0912–CV–722.

Court of Appeals of Indiana.

Nov. 24, 2010.

Rehearing Denied Feb. 23, 2011.

736

John Z. Huang, Assistant Corporation Counsel, John B. Drummy, Robert M. Kelso, J. Andrew Price, Kightlinger & Gray, LLP, Maggie L. Smith, Frost Brown Todd LLC, Indianapolis, IN, Attorneys for Appellants.

Paul K. Ogden, Adam Lenkowsky, Roberts & Bishop, Indianapolis, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Clarke Kahlo and Howard Elder ("Plaintiffs"), individually and as purported class representatives, filed a complaint against the City of Indianapolis ("the City"), the Metropolitan Development Commission ("the Commission"), and the Indiana Sports Corporation ("the ISC") (collectively "Defendants") seeking declaratory, injunctive, and monetary relief arising from Defendants' amendment to the 1985 Project Agreement for Private Redevelopment of Square 88 ("the 1985 Agreement") executed by the City and the ISC. Defendants filed a motion for judgment on the pleadings. Following a hearing, the court denied Defendants' motion, treating the same as a motion for summary judgment. On interlocutory appeal, we consider the following restated issues:

1. Whether the trial court erred when it concluded that Plaintiffs, individually and as purported class representatives, had standing to file an action for declar-

atory, injunctive, and monetary relief based on Defendants' 2007 amendment of the 1985 Agreement regarding the Union Station Center Redevelopment Plan.

2. Whether the 1985 Agreement constitutes a redevelopment plan as contemplated under Indiana Code Section 36–7–15.1–8 or a project agreement as contemplated under Indiana Code Section 36–7–25–5.

3. Whether Defendants were subject to Indiana Code Section 36–1–11–3, which controls the City's disposition of property, when they executed the amendment to the 1985 Agreement.

4. Whether Defendants' execution of the Amendment to the 1985 Agreement triggered the buyout provision in the 1985 Agreement's restrictive covenant.

We affirm in part, reverse in part, and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

In 1981, the Commission adopted certain resolutions to create the Union Station Center Urban Renewal Plan ("the Renewal Plan").[1] Over time, the Commission passed resolutions that amended and expanded the redevelopment plan and area. Those resolutions established a redevelopment plan for the declared areas on the near south side of downtown Indianapolis. The area covered by the redevelopment plan includes a block known as Square 88,

which includes the real estate now commonly known as Pan Am Plaza.

In March 1985, the Commission passed Resolution No. 29, which authorized the City's Department of Economic and Housing Development to purchase Square 88 in furtherance of the Renewal Plan. Square 88 was then purchased along with other real property as part of the Renewal Plan.[2] In November, the Commission passed Resolution No. 406, approving the ISC's proposal to purchase and redevelop Square 88. As a result, on December 26, 1985, the "Consolidated City of Indianapolis For the Use and Benefit of Its Department of Metropolitan Development" conveyed Square 88 by warranty deed ("Warranty Deed") to the ISC. Appellants' App. at 140. On the same date, the City, "acting by and through its Department of Metropolitan Development[,]" and the ISC entered into a "Project Agreement for Private Redevelopment of Square 88[,]" namely, the 1985 Agreement. *Id.* at 143. The 1985 Agreement includes, in relevant part, the following terms:

The Redeveloper [the ISC] shall construct or enter into agreements by which others construct, upon the Project Area a plaza not less that [sic] 88,000 square feet in area, a multistoried parking garage beneath the plaza level containing not less than 800 parking spaces, and an office building above the plaza level containing not less than 100,000 square feet (said plaza, parking garage

---

1. The terms "renewal plan" and "redevelopment plan" are synonymous. The City used the term "Renewal" in the name of the Union Station Center project, but the parties, at oral argument and in their briefs, use the term "redevelopment plan." Indiana Code Section 36–7–15.1–8, which describes the required contents of a redevelopment plan, also uses those terms interchangeably. We will do like-

wise by referring to the Union Station Center plan as "the Renewal Plan" and by referring generically to that or any such plan as a redevelopment plan.

2. The parties dispute whether the City or the Commission is the former owner of record title owner of Square 88. We address that issue below.

and office building are collective referenced to herein as the "Improvements").

\* \* \*

2.8 *Plaza Restrictive Covenants.* Upon closing, the Redeveloper [the ISC] shall subject not less that [sic] 88,000 square feet of the Project Area located above the plane of the top of the parking garage to the Restrictive Covenant. The Restrictive Covenant shall be for a term of thirty (30) years (subject to certain release provisions provided for below) and shall restrict the use and development of said portion of the Project Area to use as a plaza, with only such improvements thereon as are customary or otherwise compatible with such use. The Redeveloper and its successors and assigns shall retain title, possession, use, control and responsibility for such portion of the Project Area, but *the use of such area by the public (in each case upon reasonable terms and conditions, including reasonable time restrictions, and without lease, license, or use fees, except reasonable maintenance, security and insurance charges) shall not be unreasonably withheld or delayed.* Upon the twentieth (20th) anniversary of the closing date, and thereafter throughout the remaining term of the Restrictive Covenant, the Restrictive Covenant shall expire upon its own terms and be of no further force or effect upon payment by the Redeveloper or its successor or assigns to the City of Three Million Dollars ($3,000,-000.00) as increased from the date of closing of this Agreement in order to reflect the changes in the cost of living as reflected by changes in the "Consumer Price Index—All Urban Consumers— U.S. City Average;" hereinafter called the "Index," published by the Bureau of Labor Statistics of the U.S. Department of Labor.... In no event shall such

payment be less than Three Million Dollars ($3,000,000.00) nor more than Six Million Five Hundred Thousand Dollars ($6,500,000.00). Upon the thirtieth (30th) anniversary of the closing date the Restrictive Covenant shall expire upon its own terms and be of no further force or effect without payment or charge of any kind.

*Id.* at 146, 148–49 (emphasis added). In other words, the covenant required the ISC to maintain a plaza for the use and benefit of the public, but a buyout provision allowed the ISC to terminate the covenant before its stated expiration date. Following execution of the Warranty Deed, the ISC caused to be constructed an office building, an underground parking lot, and a plaza as required by the 1985 Agreement. The plaza contemplated in the agreement is commonly known as Pan Am Plaza.

On December 19, 2007, some twenty-two years after execution of the 1985 Agreement, the Commission adopted Resolution 07–R–70, which authorized the Department of Metropolitan Development to "enter into an amendment with [the ISC] reducing the plaza area subject to the Agreement's Restrictive Covenant to ten thousand (10,000) square feet." *Id.* at 161. On December 21, the ISC and the "Consolidated City of Indianapolis, Indiana, acting by and through its Department of Metropolitan Development[,]" executed an "Amendment to Project Agreement for Private Redevelopment of Square 88" ("the Amendment"). In relevant part, the Amendment carried out Resolution 07–R–70, replacing the Restrictive Covenant in the 1985 Agreement with the following language:

The Redeveloper shall subject not less than 10,000 square feet of the Project Area located above the plane of the top of the parking garage to the Restrictive

Covenant. The *10,000[-]square[-]foot project area shall permanently remain as open space (subject to certain release provisions provided for below).* The Restrictive Covenant shall restrict the use and development of said portion of the Project Area to use as a plaza, with only such improvements thereon as are customary or otherwise compatible with such use. The Redeveloper [the ISC] and its successors and assigns shall retain title, possession, use, control and responsibility for such portion of the Project Area, but *the use of such area by the public (in each case upon reasonable terms and conditions, including reasonable time restrictions, and without lease, license or use fees, except reasonable maintenance, security and insurance charges) shall not be unreasonably withheld or delayed.* Upon the twentieth (20th) anniversary of the closing date, and thereafter throughout the remaining term of the Restrictive Covenant, the Restrictive Covenant shall expire upon its own terms and be of no further force or effect upon payment by the Redeveloper or its successors or assigns to the City of Three Million Dollars ($3,000,000.00) as increased from the date of closing of this Agreement in order to reflect changes in the cost of living as reflected by changes in the "Consumer Price Index—All Urban Consumers—U.S. City Average;" hereinafter called the "Index," published by the Bureau of Labor Statistics of the U.S. Department of Labor . . . .

*Id.* at 163 (emphases added). Thus, the Amendment reduced the size of the plaza from 88,000 square feet to 10,000 square feet and removed the thirty-year term of the restrictive covenant. Instead, the now smaller plaza shall remain for public use in perpetuity unless the ISC, or its successors or assigns, pays to the City three million dollars adjusted for inflation.

In July 2008, Plaintiffs filed their Class Action Complaint.[3] In the Complaint, Plaintiffs allege that Defendants "wholly failed to follow the procedural requirements for modifying a redevelopment agreement under Indiana law as set forth in [Indiana Code Chapter] 36–7–15.1 et[ ] seq." *Id.* at 27. Plaintiffs further allege that the amendment to the 1985 Agreement resulted in a disposition of City property and therefore, under Indiana Code Section 36–1–11–3, that Defendants should have obtained City–County Council approval before executing the Amendment. As a result, Plaintiffs seek declaratory, injunctive, and monetary relief. On September 15, 2008, the ISC filed its Answer and Affirmative Defenses. And on the following day the City and the Commission jointly filed their Answer to Plaintiffs' Complaint as well as a motion for judgment on the pleadings.

On October 8, Plaintiffs filed a response to Defendants' motion for judgment on the pleadings. Defendants subsequently filed a joint reply. On June 24, 2009, at Defendants' request, the court held a hearing on the motion for judgment on the pleadings. And on September 21, the trial court entered its order ("Order"), which contains sua sponte findings and conclusions. The trial court treated Defendants' motion as one for summary judgment due to Defendants' designation of exhibits to their answers. The court found in relevant part that Plaintiffs had standing to pursue the complaint under the public standing doctrine;[4] that a genuine issue of material fact exists as to whether the 1985 Agree-

---

3. The Complaint has not yet been certified as a class action.

4. The trial court made no findings as to whether Plaintiffs had standing as third party beneficiaries to the 1985 Agreement.

ment was a project agreement or a redevelopment plan; that there exists a genuine issue of material fact as to whether the reduction in the plaza's size accomplished through the Amendment required the City–County Council's approval under Indiana Code Section 36–1–11–3; and that there was a genuine issue of material fact as to whether amending the 1985 Agreement triggered the buyout provision in the restrictive covenant. As a result, the Order denied summary judgment for Defendants. Defendants then sought and we granted leave to file a permissive interlocutory appeal.

## DISCUSSION AND DECISION

### Standard of Review

Defendants appeal the Order denying their joint motion for judgment on the pleadings. A motion for judgment on the pleadings tests the sufficiency of the complaint to state a redressable claim, not the facts to support it. *Book v. Hester*, 695 N.E.2d 597, 599 (Ind.Ct.App.1998). The test to be applied is whether the allegations of the complaint, taken as true and in the light most favorable to the nonmovant and with every intendment regarded in his favor, sufficiently state a redressable claim. *Id.* When the pleadings present no issues of material fact and the facts shown by the pleadings clearly entitle a party to judgment, the entry of judgment on the pleadings is appropriate. *See id.* But when a motion for judgment on the pleadings is predicated, as here, on matters extraneous to the pleadings,[5] the motion should be treated in the same manner as a motion for summary judgment. Ind. Trial Rule 12(C). Any procedural irregularity in the conversion of a Trial Rule 12 motion to a motion for summary judgment will be harmless where the conversion does not result in prejudice to the appellant. *Book*, 695 N.E.2d at 599.

When reviewing a trial court's ruling on a motion for summary judgment, we apply the same standard as the trial court. No deference is given to the trial court's judgment. *Hutchens v. MP Realty Group–Sheffield Square Apartments*, 654 N.E.2d 35, 37 (Ind.Ct.App.1995), *trans. denied.* Summary judgment is appropriate only if the designated evidence shows that there is no genuine issue of material fact and that a party is entitled to judgment as a matter of law. T.R. 56(C).

### Issue One: Standing

Defendants contend that Plaintiffs lack standing to bring the Complaint seeking declaratory, injunctive, and monetary relief. Specifically, Defendants question Plaintiffs' standing because they were not parties to the contract containing the Restrictive Covenant. Defendants also argue that Plaintiffs are not third party beneficiaries of that contract and have no standing under the public standing doctrine. Plaintiffs counter that they have standing both as third party beneficiaries and under the public standing doctrine. We conclude that Plaintiffs have standing as third party beneficiaries to the 1985 Project Agreement.[6]

"The judicial doctrine of standing focuses on whether the complaining party

---

**5.** Indiana Rule of Trial Procedure 7(A) defines a pleading as, "(1) a complaint and an answer; (2) a reply to a denominated counter-claim; (3) an answer to a cross-claim; (4) a third-party complaint, if a person not an original party is summoned under the provisions of Rule 14; and (5) a third-party answer." Here, in support of their motion for judgment on the pleadings, Defendants relied on exhibits to their answer.

**6.** Because we conclude that Plaintiffs have standing as third party beneficiaries, we need not address the parties' arguments under the public standing doctrine.

is the proper party to invoke the court's power." *Founds. of E. Chic., Inc. v. City of E. Chi.*, 927 N.E.2d 900, 903 (Ind.2010) (citing *State ex rel. Cittadine v. Indiana Dept. of Transp.*, 790 N.E.2d 978 (Ind. 2003)). Courts seek to assure that litigation will be actively and vigorously contested. *Id.* (citing *Schloss v. City of Indianapolis*, 553 N.E.2d 1204 (Ind.1990)). "It is generally insufficient that a plaintiff merely has a general interest common to all members of the public." *Id.* (citing *Terre Haute Gas Corp. v. Johnson*, 221 Ind. 499, 45 N.E.2d 484 (1942)). "Standing requires that a party have 'a personal stake in the outcome of the lawsuit and must show that he or she has sustained or was in immediate danger of sustaining, some direct injury as a result of the conduct at issue.'" *Id.* (quoting *Higgins v. Hale*, 476 N.E.2d 95, 101 (Ind.1985)).

 Normally, "one not a party to a contract has no standing to enforce it." *Gregory & Appel Ins. Agency v. Phila. Indem. Ins. Co.*, 835 N.E.2d 1053, 1058 n. 7 (Ind.Ct.App.2005) (quoting *Nahmias Realty, Inc. v. Cohen*, 484 N.E.2d 617, 623 (Ind.Ct.App.1985)). But a third party beneficiary of a contract has standing to enforce it. For a contract to be enforceable by a third party,

> it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party must affirmatively

appear from the language of the instrument when properly interpreted and construed.

*Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006).

 Here, the parties dispute whether the restrictive covenant in the 1985 Agreement created an obligation for the ISC to maintain the plaza in favor of the public. To resolve that dispute, we must construe the restrictive covenant.

> Restrictive covenants are generally disfavored in the law and will be strictly construed by the courts, which resolve all doubts in favor of the free use of property and against restrictions. Nevertheless, restrictive covenants are a form of express contract recognized under the law. The construction of a written contract containing restrictive covenants is a question of law for which summary judgment is particularly appropriate.

*King v. Ehrens*, 804 N.E.2d 821, 826 (Ind. Ct.App.2004) (citation omitted). The original covenanters' intent must be determined from the specific language used and the situation as it existed at the time the covenant was made. *Id.* (citations omitted). Specific words and phrases cannot be read exclusive of other contractual provisions. *Id.* Rather, the parties' intentions when entering into the contract must be determined by reading the contract in its entirety and attempting to construe contractual provisions so as to harmonize the agreement. *Id.*

Here, the recitals in the 1985 Agreement provide in relevant part that the City desired "that a portion of the Project Area [Square 88] be subject to certain restrictive covenants restricting the use and development of said portion to a plaza which *shall be accessible to the public* as provided for in [the 1985] Agreement[.]" Appellants' App. at 143–44 (emphasis added).

And, again, the restrictive covenant in the 1985 Agreement provides, in relevant part:

Upon closing, the [ISC] shall subject not less that [sic] 88,000 square feet of the Project Area located above the plane of the top of the parking garage to the Restrictive Covenant. The Restrictive Covenant shall be for a term of thirty (30) years (subject to certain release provisions provided for below) and shall restrict the use and development of said portion of the Project Area to use as a plaza, with only such improvements thereon as are customary or otherwise compatible with such use. The Redeveloper and its successors and assigns shall retain title, possession, use, control and responsibility for such portion of the Project Area, but *the use of such area by the public (in each case upon reasonable terms and conditions, including reasonable time restrictions, and without lease, license or use fees, except reasonable maintenance, security and insurance charges) shall not be unreasonably withheld or delayed.* . . .

Appellants' App. at 148 (emphasis added).

The City and the ISC executed the 1985 Agreement in furtherance of the City's Union Station Center Urban Renewal Plan, which it established to revitalize a blighted area on the south side of downtown Indianapolis. Once fulfilled, the terms of the 1985 Agreement furthered the intent of the Renewal Plan as well as terms in a separate project agreement executed under the Renewal Plan.[7] Considering the plain language contained within the 1985 Agreement, we conclude that the contracting parties intended to create rights in favor of the public, namely, the right to reasonable use of the plaza for no fee excepting reasonable fees for maintenance, security, and insurance.

Still, Defendants contend that the 1985 Agreement does not contain "affirmative language that places a direct obligation or duty upon the Indiana Sports Corporation for the benefit of the public." Appellants' Brief at 16. We cannot agree. Again, the 1985 Agreement states specifically that "the use of [the plaza] by the public . . . shall not be unreasonably withheld or delayed." Appellants' App. at 148. That the obligation is written in passive rather than active voice is of no moment. The meaning of the restrictive covenant is clear: the City and the ISC agreed that 88,000 square feet of the project area would be set aside for a plaza to be "accessible to the public" under the stated terms. *Id.* at 144. Thus, we reject Defendants' argument that the restrictive covenant in the 1985 Agreement does not obligate the ISC to provide a plaza for the public.

In sum, the specific language used in the restrictive covenant and the situation as it existed at the time the covenant was made show that the City and the ISC intended for the ISC to develop and maintain an 88,000–square–foot plaza for the use and benefit of the public. *See King,* 804 N.E.2d at 826. As such, Plaintiffs have standing as third party beneficiaries to file this action to enforce the terms of the restrictive covenant.

**Issue Two: Nature of the Agreement**

Defendants also challenge the trial court's finding that there exists a genu-

---

7. The 1985 Agreement provides in part that, in a separate project agreement between B & D Associates; Union Station Associates; Historic Station, Inc.; Robert A. Borns; and Sandra S. Borns, the City was "obligated to complete construction by July 31, 1986, of parking facilities adequate for the operation of the hotel which is located within Union Station" and that "the construction of a public parking garage on Square 88 containing in excess of eight hundred (800) parking spaces would satisfy the City's above-mentioned obligation to construct adequate parking facilities for the hotel[.]" Appellants' App. at 144.

ine issue of material fact as to whether the 1985 agreement is a redevelopment plan or a project agreement executed in furtherance of a redevelopment plan. In the Complaint, Plaintiffs allege that the 1985 Agreement is a redevelopment plan, as contemplated in Indiana Code Section 36–7–15.1–8, and that the City and Commission did not follow the requisite statutory procedures for amending a redevelopment plan. Defendants counter that the 1985 Agreement is actually a project agreement as contemplated in Indiana Code Section 36–7–25–5 and, as such, there were no statutory requirements for amending the 1985 Agreement. And in their reply, Plaintiffs insist that there is a genuine issue of material fact as to whether the 1985 Agreement was a redevelopment plan or a project agreement. We agree with Defendants.

We first consider whether the 1985 Agreement was a redevelopment plan or a project agreement. The construction of a contract and an action for its breach are matters of judicial determination. *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211, 215 (Ind.Ct.App.2009). Construction of a written contract is generally a question of law for which summary judgment is particularly appropriate. *Id.* Our standard of review in such cases is de novo. *Id.* When construing a contract, unambiguous contractual language is conclusive upon the parties and the courts. *Id.* If an instrument's language is unambiguous, the parties' intent is determined from the four corners of the instrument. *Id.*

If, however, a contract is ambiguous or uncertain, its meaning is determined by extrinsic evidence and its construction is a matter for the fact-finder. *Id.* When interpreting a written contract, the court should attempt to determine the parties' intent at the time the contract was made, which is ascertained by the language used to express their rights and duties. *Id.* The contract is to be read as a whole when trying to determine the parties' intent. *Id.* The court will make every attempt to construe the contractual language such that no words, phrases, or terms are rendered ineffective or meaningless. *Id.* at 216. The court must accept an interpretation of the contract that harmonizes its provisions as opposed to one that causes its provisions to conflict. *Id.*

To construe the 1985 Agreement, we look first to the statutory framework for renewal plans and redevelopment projects. Indiana Code chapter 36–7–15.1 governs the redevelopment of blighted areas in Marion County. "Redevelopment plan" is not a defined term, but Indiana Code Section 36–7–15.1–8 describes the requirements for a redevelopment plan. That statute provides in relevant part:

The redevelopment or urban renewal plan must include:

(1) maps, plats, or maps and plats, showing:

(A) the boundaries of the area needing redevelopment, the location of the various parcels of property, public ways, and other features affecting the acquisition, clearance, replatting, replanning, rezoning, or redevelopment of the area or areas, indicating any parcels of property to be excluded from the acquisition; and

(B) the parts of the area acquired that are to be devoted to public ways, levees, sewerage, parks, playgrounds, and other public purposes;

(2) lists of the owners of the various parcels of property proposed to be acquired; and

(3) an estimate of the cost of acquisition and redevelopment.

Ind.Code § 36–7–15.1–8(b). Here, in 1985 Defendants executed a document entitled

"Project Agreement for Private Redevelopment of Square 88." Appellants' App. at 143. The 1985 Agreement does not contain any maps or any estimate of the cost of acquisition and development of the parcel, a list of owners of the various parcels proposed to be acquired, or an estimate of the cost of acquiring those parcels. Such information is required in a redevelopment plan. See Ind.Code § 36–7–15.1–8. Thus, the agreement does not fit the description of a redevelopment plan found in Indiana Code Section 36–7–15.1–8.

Indiana Code Section 36–7–25–5 describes project agreements as follows:

A commission may enter into a project agreement with a developer that has been selected as the successful bidder after following the procedures set forth in IC 36–7–14–22, IC 36–7–15.1–15, or IC 36–7–15.1–44 regarding dispositions of property or interests. Any project agreement must be approved by resolution of the commission. The project agreement may contain terms and provisions for development of projects in a redevelopment or economic development area that are negotiated with the developer in the discretion of the commission, including the type and character of consideration for the disposition, conditions and covenants as to future actions of the commission and the developer, and the obligation of the commission to exercise any of the commission's powers under IC 36–7–14, IC 36–7–15.1, this chapter, or any other applicable law.[8]

Here, the terms of the 1985 Agreement require the ISC to build an office building, an underground parking facility, and the plaza at issue in this case. Those requirements constituted, in part, the consider-

ation for the purchase of Square 88. Thus, the agreement "contains terms and provisions ... for the development of the project ... including ... [the] type and character of consideration for the disposition, [and] conditions and covenants as to future actions of the commission and the developer[.]" See Ind.Code § 36–7–25–5. The agreement also refers to the "Union Station Center Urban Renewal Plan ... to guide the redevelopment of Square 88 and the other declared areas[.]" Appellants' App. at 143. And the language used in the Amendment states that the City and the ISC "desire to amend, modify and supplement the Project Agreement[.]" Appellants' App. at 162 (emphasis added). In sum, the language employed and the material elements contained in the 1985 Agreement indicate that the agreement is a project agreement.

Still, Plaintiffs contend that the trial court's conclusion that the nature of the 1985 Agreement is "clearly confusing" shows the existence of a genuine issue of material fact on that issue. In support of that conclusion, the court made the following findings:

1. Resolution 406, which accepted the ISC's proposal to purchase the property in Square 88, "references a Project Agreement and it also references I.C. 36–7–15.1, which discusses redevelopment plans." Appellants' App. at 17.

2. The 1985 Agreement is entitled "Project Agreement for Private Redevelopment of Square 88" and "also references I.C.36–7–15.1, which discusses redevelopment plans." Id.

3. Resolution 07–R–70, which approved the amendment to the 1985 Agree-

8. Indiana Code Sections 36–7–15.1–8 and 36–7–25–5 have been amended on several occasions since the execution of the 1985 Agreement. However, the amendments were mi-

nor and do not affect the issues resolved in this opinion. Thus, we refer to the current versions of those statutes.

ment, states that the City and the ISC "did pursuant to IC 36–7–15.1 enter into a Private Redevelopment Agreement in 1985 for redevelopment of Square 88." *Id.* at 18.

4. The 2007 Amendment is entitled "Amendment to Project Agreement for Private Redevelopment of Square 88." *Id.*

Hence, the trial court found that the references to Indiana Code chapter 36–7–15.1, which governs urban renewal plans, conflict with other references to project agreements. We cannot agree.

These references can be easily harmonized.[9] Each mention of chapter 36–7–15.1 refers either to the source of the City's authority to enter into the 1985 Agreement or to the fact that the City had complied with the statutory prerequisites to enter into that agreement. For example, Resolution 406 provides that the City had acted "in accordance with the requirements of IC 36–7–15.1 of the Consolidated Citites [sic] Redevelopment Law" when the Commission had "conduct[ed] the required public offering for the purchase or lease of property in Square 88"; the 1985 Agreement provides that the Commission, "acting pursuant to and in furtherance of its redevelopment authority under IC 36–7–15.1[,] has adopted appropriate declaratory and confirmatory resolutions ... creating the Union Station Center Urban Renewal Area for the purpose of redevelopment of the declared areas[;]" and Resolution 07–R–70 provides that the City, through the Department of Metropolitan Development, and the ISC "did, pursuant to IC 36–7–15.1, enter into a Private Redevelopment Agreement in 1985 for the redevelopment of Square 88[.]" *Id.* at 17–18. The trial court's conclusion that the 1985 Agreement

and the 2007 Amendment are "clearly confusing" is not supported by the evidence.

In sum, we conclude that the 1985 Agreement is not ambiguous. The contracting parties intended to execute a project agreement and, in 2007, an amendment to the project agreement, respectively. The terms of those agreements do not meet the statutory requirements under Indiana Code Section 36–7–15.1–8 for redevelopment plans. As such, we conclude that the 1985 Agreement is a project agreement and that the trial court erred when it found the existence of a genuine issue of material fact regarding the nature of that agreement.

### Issue Three: Disposal of Property

Defendants next challenge the trial court's denial of summary judgment regarding whether the reduction in the plaza's size accomplished through the Amendment required City–County Council approval pursuant to Indiana Code Section 36–1–11–3. Specifically, Defendants challenge the trial court's conclusion that a genuine issue of material fact exists regarding the applicability of Indiana Code Section 36–1–11–3. That statute provides, in relevant part: "Except as provided in section 3.2 of this chapter [regarding cities with populations of less than 105,000], the fiscal body of a unit must approve ... every sale of real property having an appraised value of fifty thousand dollars ($50,000) or more[.]" Ind.Code § 36–1–11–3(c)(1). The parties do not dispute that Square 88 had an appraised value of $50,000 or more.

■ The trial court found that the Warranty Deed conveying Square 88 to the ISC in 1985 ("the Deed") was ambiguous because it could be construed as conveying title either from the City or from

---

9. Like the trial court, we also consider the language and circumstances surrounding the execution of the Amendment in determining the nature of the 1985 Agreement.

the Department of Metropolitan Development.[10] Defendants contend that the Deed unambiguously shows that *the Commission* conveyed Square 88 to the ISC and, therefore, that the requirements in Section 36–1–11–3 do not apply. Thus, we must construe the Deed.

In construing a deed, a court should regard the deed in its entirety, considering the parts of the deed together so that no part is rejected. *Timberlake, Inc. v. O'Brien*, 902 N.E.2d 843, 850 (Ind. Ct.App.2009) (citation omitted). "[W]here there is no ambiguity in the deed, the intention of the parties must be determined from the language of the deed alone." *Brown v. Penn Centr. Corp.*, 510 N.E.2d 641, 641 (Ind.1987). Courts consider the "known use to which the property was to be subjected and therefrom give the conveyance the effect intended by the parties." *Ross, Inc. v. Legler*, 245 Ind. 655, 199 N.E.2d 346, 348 (Ind.1964) (footnote omitted).

The Commission was established by statute "*in* the Department of Metropolitan Development." Ind.Code § 36–7–4–202(c) (emphasis added). The Commission has all powers, duties, functions, and obligations prescribed by law as of August 31, 1981. Ind.Code § 36–3–5–6(a). Among its statutory powers and duties, the Commission may:

> (1) Acquire by purchase, exchange, gift, grant, lease, or condemnation, or any combination of methods, any real or personal property or interest in property needed for the redevelopment areas needing redevelopment that are located within the redevelopment district.

> (2) Hold, use, sell (by conveyance by deed, land sale contract, or other instrument), exchange, lease, rent, invest in, or otherwise dispose of, through any combination of methods, property acquired for use in the redevelopment of areas needing redevelopment on the terms and conditions that the commission considers best for the city and its inhabitants.

Ind.Code § 36–7–15.1–7. Real property acquired in furtherance of a redevelopment plan must be conveyed to "City of Indianapolis for the use and benefit of its Department of Metropolitan Development." *See* I.C. § 36–7–15.1–12(c). Similarly,

> [a]ll deeds, land sale contracts, leases, or other conveyances, and all contracts and agreements, including contracts of purchase, sale, or exchange and contracts for advancements, loans, grants, contributions, or other aid, shall be executed in the name of the "City of [Indianapolis], Department of Metropolitan Development", and shall be executed by the president or vice president of the commission or by the director of the department [of metropolitan development] if authorized.

I.C. § 36–7–15.1–15(i). In this respect, the Commission operates independent from the civil city. However, "[t]he legislative body of the consolidated city [the City of Indianapolis, the City–County Council] may adopt ordinances to regulate ... (1)[t]he time that the commission holds its meetings[, and] (2)[t]he voting procedures of the commission." I.C. § 36–7–4–202(c).

---

10. The trial court referred to Indiana Code Section 36–1–11–4 as the statute at issue, but the citation to that section must be a scrivener's error. Section 36–1–11–4 sets out the procedure the City must follow once it has obtained approval for the sale of property. That procedure includes obtaining appraisals and offering property for sale through a bidding process. Indiana Code Section 36–1–11–3 provides that approval is required for the disposal of real property having an appraised value of $50,000 or more.

748

Here, the Deed shows that "[t]he Consolidated City of Indianapolis [f]or [t]he Use and Benefit of Its Department of Metropolitan Development" conveyed Square 88 to the ISC. Appellants' App. at 47, 140, 158. The conveyance was in furtherance of the 1985 Agreement, which we have determined is a project agreement. The execution of the 1985 Agreement, in turn, furthered the purposes of the Union Station Center Redevelopment Plan. And the reference to the grantor in the Deed was in the form required by Indiana Code Section 36–7–15.1–15(i) for conveyances made by the Commission. Thus, the Deed shows that the Commission, not the City, conveyed Square 88 to the ISC. The trial court's conclusion to the contrary is clearly erroneous.[11] Because the Commission conveyed title to the ISC, the requirements under Indiana Code Section 36–1–11–3 do not apply to the conveyance of Square 88. *See* I.C. § 36–1–11–1(b)(4) ("This chapter does not apply to ... [t]he disposal of property by a redevelopment commission established under IC 36–7.").[12]

Nevertheless, Plaintiffs maintain that the City, not the Commission, transferred title to Square 88 to the ISC. In support, Plaintiffs contend that Indiana Code Section 36–7–15.1–12(c) requires that the purchase of the property for the renewal plan follow negotiations. Because "the pleadings contain no evidence that there were ever any negotiations carried on by the [C]ommission to acquire [Square 88,]" Plaintiffs contend that there is insufficient evidence to show that the Commission had ever acquired title the property. Appellees' Brief at 15. "Instead, it appears that the property [was] held by the City of Indianapolis." *Id.* We cannot agree.

Indiana Code Section 36–7–15.1–12(c) provides:

Negotiations for the purchase of property *may* be carried on directly by the commission, by its employees, or by expert negotiators employed for that purpose. The commission shall adopt a standard form of option for use in negotiations, but no option, contract, or understanding relative to the purchase of real property is binding on the commission until approved and accepted by the commission in writing. The commission may authorize the payment of a nominal fee to bind an option, and as a part of the consideration for conveyance may agree to pay the expense incident to the conveyance and determination of the title of the property. Payment for the property purchased shall be made when and as directed by the commission, but only on delivery of proper instruments conveying the title or interest of the owner to "City of ____ for the use and benefit of its Department of Metropolitan Development".

11. We also find no support for the trial court's finding that "throughout the deed it states the City of Indianapolis" somehow created an ambiguity regarding the identity of the grantor. The Deed refers to "the Consolidated City of Indianapolis For The Use and Benefit of Its Department of Metropolitan Development" as the grantor and refers to the "City of Indianapolis" when identifying the geographic location of the property conveyed. And the Deed was executed by the "Director of the Department of Metropolitan Development for and on behalf of the Consolidated City of Indianapolis." Appellants' App. at 47, 140, 158. These references to the Consolidated City of Indianapolis do not create any ambiguity.

12. Because we have determined that the Commission, not the City, conveyed Square 88 to the ISC and that Section 36–1–11–3 does not apply, we need not consider Appellants' contention that the Amendment, which reduced the size of the plaza to 10,000 square feet, constituted a "disposal" as contemplated in that statute.

(Emphasis added). The language in the statute is permissive and prescribes how the Commission is to negotiate, *if at all,* for the purchase of property as part of a redevelopment plan. The statute does not require negotiations. Moreover, property may also be acquired for a redevelopment plan by condemnation. *See* I.C. §§ 36–7–15.1–7(a)(1), –12(b). Thus, the lack of evidence that the parties negotiated the purchase of Square 88 for the Union Station Center Urban Redevelopment Plan is insignificant. Plaintiffs' contention is without merit.

### Issue Four: Termination of Restrictive Covenant

Finally, Defendants contend that the trial court erred when it found that a genuine issue of material fact exists as to whether the execution of the Amendment triggered the buyout provision of the restrictive covenant in the 1985 Agreement. Specifically, they argue that the mutual amendment of the 1985 Agreement did not eliminate the restrictive covenant but merely altered its terms. Because the Amendment modified but did not terminate the restrictive covenant, they argue, the Amendment did not trigger the buyout provision. We must agree.

Whether the restrictive covenant was terminated by the execution of the Amendment requires that we construe the covenant. Again, the construction of a written contract containing restrictive covenants is a question of law for which summary judgment is particularly appropriate. *King,* 804 N.E.2d at 826. Here, the restrictive covenant in the 1985 Agreement provides that the covenant shall expire upon the thirtieth anniversary of the closing date or upon the payment of liquidated damages to the City. The covenant provides for a buyout in the event of early termination, but not in the event of a modification.

Again, the City and the ISC agreed to amend the restrictive covenant. The Amendment reduced the size of the plaza from 88,000 square feet to 10,000 square feet, but in consideration for that reduction in size the term of the restrictive covenant was extended from its original thirty years to perpetuity. These are material alterations to the terms of the restrictive covenant, but they did not result in "termination" of the restrictive covenant since the covenant remained in effect as amended.

We can envision a scenario where the reduction in plaza size might create a question of fact as to whether the restrictive covenant had been effectively terminated. But Plaintiffs have not pointed to any evidence in the record to establish a question of fact in this regard. Thus, we conclude that the trial court erred when it found an issue of material fact as to whether the Amendment resulted in the termination of the restrictive covenant.[13]

### Conclusion

We conclude that Plaintiffs have standing to bring the Complaint as third party beneficiaries. The terms of the restrictive covenant in the 1985 Agreement created an obligation for the ISC to make the plaza available for the use and benefit of the public. The facts that the obligation was stated in passive language and that

---

13. We observe sua sponte the holding in *City of East Chicago v. East Chicago Second Century, Inc.,* 908 N.E.2d 611 (Ind.2009), which addresses a third party beneficiary's right to enforce a public contract. There the Indiana Supreme Court implicitly adopted Restatement (Second) of Contracts § 311, which sets out the circumstances under which contracting parties must seek consent from a third party beneficiary to modify their contract. *Id.* at 625. But because Plaintiffs have not alleged that their consent was required to modify the 1985 Agreement, we do not consider this issue.

the public's use had to be reasonable do not render the terms of the restrictive covenant something other than an obligation. We further conclude that the 1985 Agreement is a project agreement, not a redevelopment plan. The terms of the 1985 Agreement do not meet the statutory requirements for a redevelopment plan, but they track the statutory requirements for a project agreement between the Commission and a private party.

Additionally, we conclude that the Commission, not the City, conveyed title to Square 88 to the ISC under the terms of the 1985 Agreement. The statutory framework provides that the Commission may acquire, hold title, and convey property in furtherance of an urban renewal plan. This distinguishes the role and responsibility of the Commission and the Department of Metropolitan Development from those of the civil city, which is otherwise authorized to acquire, own, and convey real estate for other purposes. And the lack of any evidence of negotiations for the initial purchase of Square 88 is also insignificant. Indiana Code Section 36–7–15.1–12(c) provides a framework for negotiations, but negotiations are not required for the purchase of property that is to be included in a redevelopment plan. And finally, we conclude that the effect of the Amendment, which reduced the size of the plaza but extended the term of the restrictive covenant in perpetuity, did not terminate the restrictive covenant in the 1985 Agreement. As such, the trial court erred when it found the existence of a genuine issue of material fact as to whether execution of the Amendment triggered the buyout provision in the restrictive covenant.

In sum, we affirm the trial court's grant of summary judgment on the issue of standing, although on different reasoning, and we reverse the trial court's denial of summary judgment on the issues of the nature of the 1985 Agreement, the applicability of Indiana Code Section 36–1–11–3, and whether the execution of the Amendment triggered the buyout provision in the restrictive covenant of the 1985 Agreement. Thus, we affirm in part, reverse in part, and remand with instructions for the trial court to enter summary judgment for Defendants accordingly.

Affirmed in part, reversed in part, and remanded with instructions.

BAKER, C.J., and MATHIAS, J., concur.