Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 29 2012, 9:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ALAN D. WILSON**
Kokomo, Indiana

ATTORNEY FOR APPELLEE:

**DAVID A. COX**
Bayliff, Harrigan, Cord, Maugans & Cox, P.C
Kokomo, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BRADLEY J. VOSSBERG, and DIANA JACHIMIAK | ) | |
| Appellants-Defendants, | ) | |
| vs. | ) | No. 34A04-1110-PL-546 |
| GLEN A. GRAY, KIMBERLY L. GRAY, and KEVIN HARDIE, d/b/a THE HARDIE GROUP | ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE HOWARD SUPERIOR COURT 2
The Honorable Brant J. Parry, Judge
Cause No. 34D02-0907-PL-846

**August 29, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

The Howard Superior Court entered judgment against Bradley Vossberg ("Vossberg") and Diana Jachimiak ("Jachimiak") (collectively "the Buyers") and in favor of Glen Gray, Kimberly Gray (collectively "the Grays"), and Kevin Hardie d/b/a the Hardie Group ("Hardie"), after the Buyers failed to purchase the Grays' home pursuant to a purchase agreement. The Buyers appeal and present two issues, which we renumber and restate as:

I. Whether the trial court erred in concluding that the Buyers breached the purchase agreement;

II. Whether the trial court erred in determining the amount of damages awarded to the Grays; and

III. Whether the trial court erred in concluding that Hardie was a third party beneficiary of the purchase agreement and therefore entitled to damages and attorney fees.

We affirm the trial court's award of damages to the Grays because there was evidence to support the trial court's finding that the Buyers breached the terms of the purchase agreement, but we reverse with regard to the award of damages to Hardie because the trial court erred in determining that Hardie was a third party beneficiary of the purchase agreement.

**Facts and Procedural History**

The facts most favorable to the trial court's judgment reveal that the Grays listed their home in Kokomo, Indiana for sale on October 21, 2008 and contracted with Hardie and Jenny Beals, a broker employed by Hardie, to act as their real estate brokers. Pursuant to the listing agreement entered into by the Grays and Hardie, the latter was to

2

receive a commission of six percent of the sale price of the home, which commission would be split with any buyer's agent.

On February 11, 2009, the Buyers signed a purchase agreement ("the Agreement") to purchase the Grays' home for the price of $228,250 and paid $1,000 in earnest money. Pursuant to the Agreement, purchase of the Grays' home was contingent on the Buyers obtaining a mortgage loan for eighty percent of the purchase price of the home. The Agreement contained the following language regarding the time the Buyers had to obtain financing:

> Buyer agrees to make written application for any financing necessary to complete this transaction or for approval to assume the unpaid balance of the existing mortgage within 7 days after the acceptance of this Agreement and to make a diligent effort to meet the lender's requirements and to obtain financing in cooperation with the Broker and Seller. No more than 30 days after acceptance of the Agreement shall be allowed for obtaining favorable written commitment(s) or mortgage assumption approval. If a commitment or approval is not obtained within the time specified above, this Agreement shall terminate unless an extension of time for this purpose is mutually agreed to in writing.

Appellant's App. p. 28.

More than two months earlier, however, in November 2008, the Buyers had been pre-approved for a mortgage loan in the price range of the Grays' house with First Republic Mortgage Corp. ("FRMC"). This pre-approval did not reference any particular purchase, and the loan was not yet final. After entering into the Agreement, the Buyers applied for a mortgage loan to purchase the Grays' house. FRMC then hired an appraiser to assess the value of the house, and this appraiser ultimately determined that the house was valued at $230,000.

Closing was scheduled for April 3, 2009, and was to be facilitated through Metropolitan Title. Prior to the closing, FRMC sent various documents to Metropolitan Title via email. These documents included closing instructions, a payoff statement, and a homeowner's insurance policy binder. Also prior to closing, FRMC approved the Buyers for the loan and wired the closing funds to Metropolitan Title in anticipation of the closing.

On April 3, 2009, the Buyers contacted their agent and instructed her to prepare an addendum to the Agreement that would modify the sale price of the home from $228,250 to $185,000. This addendum was sent to the Grays' agent on that day. The Grays rejected the reduced price in the addendum and went to closing as scheduled. The Buyers did not go to the scheduled closing, and Metropolitan Title eventually returned the closing funds that it had received from FRMC. FRMC later informed Metropolitan Title that the Buyers had elected not to close on the Agreement.

After the Buyers failed to close on the property, the Grays instructed their agent to re-list the property for sale. Mr. Gray was already living and working in California while his wife and children remained in Indiana. Thus, the Grays were under pressure to sell their house in Indiana in order to reunite their family. The Grays lowered the price on their house, and eventually sold the house to another party for $185,000—$43,250 less than the price called for in the Agreement with the Buyers. Hardie received a 6% commission of the $185,000.

On July 8, 2009, the Grays and Hardie filed suit against the Buyers, alleging that they had breached the Agreement by not following through on the purchase of the Grays'

4

house.  A bench trial was held on August 8, 2011, and the trial court entered findings of fact and conclusions of law in favor of the Grays and Hardie on September 28, 2011. The trial court determined that the Grays had breached the Agreement and were liable for the difference between the contracted price and the price at which the Grays eventually sold their house, less the $1,000 in earnest money already submitted by the Buyers, i.e. $42,250.  The trial court also held the Buyers liable for consequential damages in the amount of $1,717.03.  The trial court further determined that Hardie was entitled to $1,297.50, the difference in his commission between the sale price in the Agreement and the price the house was ultimately sold for.  The Agreement also provided that the prevailing party was entitled to recover attorney fees, and the trial court ordered the Buyers to pay the Grays' attorney fees in the amount of $9,500 and Hardie's attorney fees in the amount of $1,000.  The Buyers now appeal.

**Standard of Review**

When, as here, issues are tried by the court without a jury, Indiana Trial Rule 52 provides that a trial court "shall find the facts specially and state its conclusions thereon" either "[u]pon its own motion" or upon "the written request of any party filed with the court prior to the admission of evidence."  We apply the following two-tier standard of review to sua sponte findings and conclusions: whether the evidence supports the findings, and whether the findings support the judgment. Argonaut Ins. Co. v. Jones, 953 N.E.2d 608, 614 (Ind. Ct. App. 2011), trans. denied.[1]  Findings and conclusions will be

---

[1]  Our standard of review of findings of fact and conclusions of law entered pursuant to Trial Rule 52 differs slightly depending upon whether the entry of findings and conclusions were entered upon the trial court's motion or upon a written request of the parties. Jones, 953 N.E.2d at 614.  Here, it appears that neither party filed a written request for

5

set aside only if they are clearly erroneous, that is, when the record contains no facts or inferences supporting them. Id. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. Id. We consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility. Id. Although we defer to the trial court's factual findings, we evaluate questions of law *de novo*. McCauley v. Harris, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010).

## I. Breach of the Agreement

The Buyers first claim that they did not breach the Agreement because the Agreement conditioned the sale of the house on the Buyers receiving a written loan commitment, which they insist they never received. The relevant portion of the Agreement provided:

> No more than 30 days after acceptance of the Agreement shall be allowed for obtaining favorable written commitment(s) or mortgage assumption approval. If a commitment or approval is not obtained within the time specified above, this Agreement shall terminate unless an extension of time for this purpose is mutually agreed to in writing.

Appellant's App. p. 28. The Buyers insist that they never received a *written* loan approval and that the Agreement therefore terminated pursuant to his provision.[2]

---

findings of fact and conclusions thereon and that the trial court's findings and conclusions were entered sua sponte. In such situations, the specific findings control our review and the judgment only as to the issues those specific findings cover. Id. Where there are no specific findings, a general judgment standard applies and we may affirm on any legal theory supported by the evidence adduced at trial. Id.

[2] We note that the failure to perform a condition precedent is an affirmative defense that must be specifically and particularly asserted in a responsive pleading. Ind. Trial Rule 9(C); Dave's Excavating, Inc. v. City of New Castle, 959 N.E.2d 369, 383 (Ind. Ct. App. 2012), trans. denied. Here, the Buyers' responsive pleading contained no assertion of any affirmative defenses to the Plaintiffs' breach of contract claim. Appellees' App. pp. 18-21. Thus, it would appear that the Buyers waived their argument regarding the failure to fulfill the condition precedent that they obtain a loan commitment letter. However, because we prefer to consider issues on their merits, we address the

The Grays note, however, that the termination provision does not require a *written* loan commitment. It states simply that "if a commitment . . . is not obtained" within the given time period, then the "Agreement shall terminate . . . ." Id.

And there is evidence that such a commitment was in fact obtained. First, the Buyers obtained from FMRC a document titled "Mortgage Loan Commitment," which informed them that "their application for a first mortgage loan has been approved subject to the following matters set forth below." Appellant's App. p. 25. Furthermore, an employee of FRMC emailed the Buyers on April 10, 2009, and informed them:

> Just so you know we sent the money to closing because as we were proceeding with the loan, we have to make sure that it is handled as we expected to get the approval. *We did get the approval* but in anticipation of the approval we sent the funds to closing as the closing had been set by the realtors *and we had you approved*, just needed to get the appraisal approved. The appraiser addressed the concerns and had verbally stated that the support data was on it[s] way and again in anticipation of that we sent our funds to closing.
>
> If we would not have approved the loan, all conditions, then the title company would not have been given a "clear to close" signal from us to proceed to close the file and use our funds.

Appellees' App. p. 109 (emphasis added). Thus, there was evidence before the trial court indicating that the Buyers did, in fact, obtain a loan commitment. Indeed, as noted in the email, if the loan had not been approved, FRMC would not have given its approval to proceed to closing and wire the funds to the title company.

Moreover, even if the Agreement required that the Buyers obtain a "written" commitment, in this age of technology, receiving an email or other electronic

Buyers' claims infra. See Omni Ins. Group v. Poage, 966 N.E.2d 750, 753 (Ind. Ct. App. 2012) (noting that this court prefers to decide a case on the merits when possible).

7

communication would satisfy the requirement that the commitment be "written." The fact that an email is not necessarily printed onto paper does not mean that it is not "written." See, e.g., Lamle v. Mattel, Inc., 394 F.3d 1355, 1362 (Fed. Cir. 2005) (holding that emails, like telegrams, may be sufficient to satisfy writing requirement of the statute of frauds); Cloud Corp. v. Hasbro Inc., 314 F.3d 289, 295-96 (7th Cir. 2002) (concluding that emails from the defendant's agent to the plaintiff, in combination with an additional document, satisfied the statute of frauds requirement of written contract).

The Buyers' reliance on Keliher v. Cure, 534 N.E.2d 1133 (Ind. Ct. App. 1989), is misplaced. In that case, the purchase agreement required the buyer to obtain a favorable loan commitment, but the commitment they actually received was conditional. The court therefore held that a favorable commitment was not timely obtained. Id. at 1136. In contrast, here the loan commitment was obviously not conditional; the mortgage company actually approved the loan and forwarded the funds to the title company for closing.

The Buyers also claim that the Grays prevented them from being able to obtain a loan commitment at the time of closing by moving the closing date to April 3, 2009. An addendum to the Agreement provided that the closing was to occur on or before April 9, 2009. Appellant's App. p. 35. The Buyers claimed, and the trial court found, that they were unaware that the closing had been scheduled for April 3, 2009. But even if the Buyers were unaware of the scheduled closing date, this does not mean that the Grays prevented the Buyers from obtaining the loan commitment on or before April 9. There is no indication that the April 3 closing date caused the Buyers to be unable to obtain a loan

commitment. Indeed, the Buyers were able to contact their broker on April 3 and have her draft a proposed addendum lowering the purchase price of the house considerably. More importantly, as stated above, the Buyers were in fact able to obtain a loan commitment as indicated by the fact that the mortgage company forwarded the funds to the title company for the closing.

## II. Damages

The Buyers also argue that the reduced price the Grays eventually accepted for the sale of their house was not caused by any breach on part of the Buyers. Instead, the Buyers allege that the lower sale price was the result of the Grays desire to sell the house quickly so that the family could be reunited in California. Although there was evidence that the Grays were "motivated" sellers, the Grays had also spent a substantial amount of time dealing with the Buyers. And while the sale to the Buyers was pending, the Grays' home was effectively off the market. After the Buyers declined to follow through with the Agreement, the Grays had to relist the house for sale, and it still took several months for them to find another buyer.

It is well settled that "[t]he proper measure of damages is the difference between the sale price of the property to be sold and the fair market value of that property at the time of the buyer's breach. Showalter, Inc. v. Smith, 629 N.E.2d 272, 275-76 (Ind. Ct. App. 1994), trans. denied, abrogated on other grounds by Mitchell v. Mitchell, 695 N.E.2d 920 (Ind. 1998); see also Rogers v. Lockard, 767 N.E.2d 982, 990 (Ind. Ct. App. 2002). Here, the Buyers cannot complain that the $185,000 the Grays ultimately sold their house for was not a fair market value. The Buyers themselves offered to pay

9

$185,000 after backing out of the initial agreement to pay $228,250. Their offer belies their current argument that $185,000 was an unfairly low price for the Grays' house. See Showalter, 629 N.E.2d at 276 (noting that the price voluntarily paid by a purchaser is admissible as evidence of the property's fair market value).

### III. Third Party Beneficiary

The Buyers last argue that the trial court erred in awarding damages to Hardie, who owned the real estate agency used by the Grays to sell their house. The Buyers first claim that Hardie was the owner of a corporation, the Hardie Group, and that Jenny Beals, not Hardie, was their agent. The Buyers therefore argue that Hardie, as the individual owner of the corporation had no standing to sue for a breach of contract on behalf of the corporation. The trial court concluded, however, that Hardie was a third-party beneficiary of the Agreement.

Normally, one who is not a party to a contract has no standing to enforce it. City of Indianapolis v. Kahlo, 938 N.E.2d 734, 742 (Ind. Ct. App. 2010), trans. denied. But a third party beneficiary of a contract does have standing to enforce it. Id. However, for a contract to be enforceable by a third party beneficiary, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. Id. It is not enough that performance of the contract would simply be of benefit to the third party; instead, it must appear that it was the intention of one of the parties to require performance of some part of the contract in favor of such third party and for his benefit and that the other party to the agreement intended to assume the obligation thus imposed. Id. The intent of the contracting parties to

10

bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed. Id. (citing Cain v. Griffin, 849 N.E.2d 507, 514 (Ind. 2006)).

Here, the Agreement lists Hardie and Beals as the listing broker, and paragraph 25 of the agreement states in pertinent part:

> Buyer and Seller acknowledge that each has received agency office policy disclosures, has had agency explained, and now confirms all agency relationships. Buyer and Seller further acknowledge that they understand and accept agency relationships involved in this transaction.

Appellant's App. p. 32. This simply indicates that the parties accepted and understood the agency relationships involved in the transaction. There is no mention of any commission to be paid to the brokers. Nor is there any affirmative language bestowing upon the brokers any affirmative right to a commission. Although, the Grays did enter into a listing agreement with Hardie and Beals, this was an agreement solely between the Grays, Beals, and Hardie. Accordingly, the trial court's conclusion that Hardie was a third party beneficiary of the Agreement was clearly erroneous, and the award of damages to Hardie was therefore improper. And because the award of damages to Hardie was improper, he was not a prevailing party entitled to attorney fees.

## Conclusion

The trial court did not clearly err in concluding that the Buyers breached the Agreement and in awarding damages to the Grays. However, because Hardie was not a third party beneficiary of the Agreement, the award of damages and attorney fees to him

was improper. Accordingly, the judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to vacate the award of damages to Hardie.

Affirmed in part, reversed in part, and remanded.

VAIDIK, J., and BARNES, J., concur.