ARGONAUT INSURANCE COMPANY,
Appellant,

v.

Christopher T. JONES, Individually and
as Personal Representative of the Estate of Sarah I. Jones, Deceased, Appellee.

No. 53A01–1012–PL–669.

Court of Appeals of Indiana.

Aug. 25, 2011.

Liberty L. Roberts, Collier–Magar & Roberts, P.C., Indianapolis, IN, Attorney for Appellant.

William J. Spalding, Spalding Law LLC, Bloomington, IN, Attorney for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Argonaut Insurance Company ("Argonaut") appeals from the trial court's entry of summary judgment and subsequent entry of declaratory judgment against it and in favor of Christopher T. Jones ("Jones"), individually and as personal representative of the Estate of Monroe County Sheriff's Deputy Sarah I. Jones ("Deputy Jones"), after Deputy Jones was struck and killed by a vehicle driven by Bree Myers ("Myers") while Deputy Jones, on-duty and acting in her capacity as a Deputy Sheriff in Monroe County, was directing traffic around a car accident site on Indiana State Road 45.

We affirm.

### Issues

Argonaut presents several issues for our review, which we reframe as:

I. Whether the trial court erred when it held that Deputy Jones was an "insured" under the automobile insurance liability policy covering the Monroe County Sheriff Department's police vehicles, and thus was entitled to coverage under the Uninsured/Underinsured Motorist ("UIM") endorsement associated with the insurance policy;

II. Whether the collision leading to Deputy Jones's death was caused by her use of a police vehicle as contemplated by the policy and Indiana law; and

III. Whether the trial court erred when it held that Deputy Jones's death was subject to coverage under the policy, despite the presence of a policy exclusion for injuries arising in the course of employment.

### Facts and Procedural History

On October 17, 2008, at around 10:20 p.m., Deputy Jones, then on duty with the Monroe County Sheriff's Department, had been dispatched in her police cruiser to the scene of a slide-off of a pickup truck alongside State Road 45 in Monroe County. Deputy Jones had parked her cruiser in the parking lot of a nearby store. Stephen Sims, a tow-truck driver, had been dispatched to retrieve the pickup truck and pulled into the parking lot. He advised Deputy Jones to remain in her car while he evaluated the pickup truck to determine what work he needed to do to tow the vehicle out of the nearby ravine.

After investigating the slide-off, Sims returned to Deputy Jones and asked her to block the southwest-bound lane so he could position his tow truck. Following proper police procedure, Deputy Jones placed her vehicle in the southwest-bound lane of State Road 45, left the engine running, and activated the blue-and-red emergency lights on her vehicle to redirect traffic. Sims activated the amber warning lights on his tow truck. Deputy Jones's car was within the southwest-bound lane of traffic, parked at a slight angle with its nose pointed toward the shoulder and a small portion of its fender over the white fog line. The tow truck straddled the road and grass shoulder in a turn lane south of Deputy Jones's patrol car, which was somewhere between twenty and sixty-nine feet behind the tow truck.[1]

---

1. There was a factual dispute about the distance based on measurements by Trooper Kristopher Fitzgerald compared to estimates by tow-truck driver Stephen Sims, which the trial court took into account as inferences favoring the non-moving party as to each of the summary judgment motions.

After positioning her patrol car to control the flow of traffic and alert drivers of her presence and that of the accident site, cars began to line up behind Deputy Jones's vehicle. She then began to direct traffic using hand signals and a flashlight.

About fifteen minutes after Deputy Jones had begun directing traffic, Sims told her that he would need the entire road blocked, not just one lane, and returned to his car. Sims had just returned to his tow truck and was preparing to move his truck when he heard a scream and the sound of glass breaking. He turned to see Myers's Jeep, traveling at least 45 miles per hour, with Deputy Jones's body pressed against the front of the Jeep. Myers pulled into a nearby parking lot, where Deputy Jones's body slid off the hood of the vehicle and fell to the ground.

Deputy Jones was taken by ambulance to Bloomington Hospital; doctors at the hospital ordered her transferred by helicopter to Methodist Hospital in Indianapolis. Deputy Jones was severely injured, with numerous fractures and internal injuries. Throughout her treatment, she remained unresponsive and never recovered, passing away early on October 19, 2008.

Myers carried automotive insurance coverage with bodily injury policy limits of $50,000, and her insurer agreed to pay Jones the policy limits. Deputy Jones's vehicle was insured under a policy the Monroe County Board of Commissioners ("Board of Commissioners") purchased from Argonaut, which included a UIM endorsement with policy limits of $1,000,000 per incident.

On March 25, 2009, Jones, in both his individual capacity and as representative of Deputy Jones's estate, filed suit against Myers and her insurer, State Farm Mutual Automobile Insurance Company; Argonaut; and Monroe County's umbrella insurance carrier, Lexington National Insurance Corporation. Jones claimed that Deputy Jones was an insured of Argonaut under the UIM endorsement of the policy Argonaut wrote for Monroe County, and sought a declaratory judgment requiring Argonaut to pay up to its policy limits for losses arising from Myers's collision with Deputy Jones. The complaint requested a jury trial on all issues.

After engaging in discovery, on July 27, 2009, Jones filed his motion for partial summary judgment against Argonaut, contending that Deputy Jones was insured under the UIM endorsement of the Argonaut policy. Among the items of evidence designated in support of the motion were Argonaut's policy, an affidavit from Sims, and a crash reconstruction report with diagrams and photographs from Indiana State Police Trooper Kristopher Fitzgerald ("Trooper Fitzgerald"). On October 2, 2009, Jones sought permission to amend his motion in light of additional discovery agreed upon between Jones and Argonaut; on February 2, 2010, Jones designated additional evidence and provided a revised brief taking account of that evidence. The newly designated evidence included deposition testimony from Sims, Fitzgerald, and Myers, as well as an affirmation by Greenwood Police Chief Joseph Pitcher ("Chief Pitcher") as to Deputy Jones's deployment of her police vehicle and Myers's role in causing the collision.[2]

2. At summary judgment, Argonaut argued before the trial court that certain statements of Chief Pitcher, Chief of Police of the City of Greenwood at the time of his affirmation, were inadmissible because they were legal conclusions rather than expert opinion. We find no trial court ruling in the record on this contention, and Argonaut does not argue the point on appeal. We thus consider Chief Pitcher's statements admissible and appropri-

On March 30, 2010, Argonaut filed its motion for summary judgment as to all issues in the litigation. The same day, Argonaut also responded to Jones's outstanding motion for summary judgment. Jones filed his response to Argonaut's motion and responsive brief on May 3, 2010.

On June 30, 2010, the trial court ruled on the cross-motions for summary judgment, granting Jones's motion in his capacity as representative of Deputy Jones's estate and denying Argonaut's motion as to Deputy Jones's estate. Specifically, the trial court determined that there was no issue of material fact and that Jones was entitled to judgment as a matter of law on the questions of UIM coverage and on whether Deputy Jones was using her police car at the time Myers struck her. Having determined that Deputy Jones was covered by Argonaut's policy, the trial court held that the only question of material fact was whether Deputy Jones's injuries were caused by her use of the police car. At this time, the trial court also granted summary judgment in favor of Argonaut as to all of Jones's claims in his individual capacity.[3]

On November 17, 2010, Jones and Argonaut entered into a stipulation in which they waived jury trial and requested that the trial court act as fact finder on the remaining issue, whether Deputy Jones's injuries were caused by her use of the police car, based upon the evidence designated and arguments submitted to the trial court along with the parties' motions for summary judgment.

On December 1, 2010, pursuant to the parties' stipulation, the trial court entered its Declaratory Judgment Order. After reaffirming the conclusions it made in its summary judgment order, the trial court went on to conclude that Deputy Jones's "injuries and death resulted from her use of the Monroe County Sheriff's car, while she was engaged in the duties of directing traffic in State Road 45 on October 17, 2008." (Appellant's App. 12.) On February 22, 2011, the trial court entered a *nunc pro tunc* order granting the parties' motion requesting that trial court amend the Declaratory Judgment Order to incorporate the language of Trial Rule 54(B), finding no just reason for delay in entering judgment for Deputy Jones's estate against Argonaut.

This appeal followed.

### Discussion and Decision

#### *Standard of Review*

Argonaut appeals the trial court's entry of summary judgment against it and the Declaratory Judgment Order.

#### *The Summary Judgment Standard*

■ Argonaut challenges the entry of summary judgment on whether Deputy Jones was an insured under Argonaut's UIM endorsement and whether she was using her police car as contemplated by the liability portion of the Argonaut policy. We review the grant or denial of summary judgment under the same standard as a trial court:

> Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a

ate for use in our review of the motions for summary judgment.

3. Neither party raises any issues related to this aspect of the trial court's decision in this appeal.

material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact. *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269–70 (Ind.2009). Questions as to the interpretation of an insurance policy are particularly well-suited for summary judgment, as these are primarily issues of law for the court. *Adkins v. Vigilant Ins. Co.*, 927 N.E.2d 385, 389 (Ind.Ct.App.2010), *trans. denied.*

A trial court's decision on summary judgment is cloaked in a presumption of validity, and we may affirm on any legal theory that is supported by the evidence, and the appellant bears the burden of persuading this court that summary judgment was erroneous. *Sizemore v. Erie Ins. Exch.*, 789 N.E.2d 1037, 1038–39 (Ind.Ct. App.2003). Our standard of review on summary judgment does not change where parties have submitted opposing motions for summary judgment on the same issues; rather, we review cross-motions for summary judgment independently of one another. *Indiana Ins. Co. v. Am. Cmty. Servs., Inc.*, 718 N.E.2d 1147, 1152–53 (Ind.Ct.App.1999).

*The Findings and Conclusions Standard*

Argonaut also challenges the trial court's conclusion that Deputy Jones's injuries resulted from the use of her police vehicle, noting at one point that the trial court failed to find specific facts in reaching this conclusion. When matters are adjudicated at a trial by the court without a jury, Trial Rule 52 governs the trial court's use of findings and conclusions.

Trial Rule 52 provides that a trial court "shall find the facts specially and state its conclusions thereon" either *sua sponte* or upon "the written request of any party filed with the court *prior to the admission of evidence.*" T.R. 52(A) (emphasis added).

Upon appellate review, a judgment under Trial Rule 52 may be reversed only when clearly erroneous, that is, "when the judgment is unsupported by the findings of fact and conclusions entered on the findings." *Nelson v. Marchand*, 691 N.E.2d 1264, 1267 (Ind.Ct.App.1998). Findings are clearly erroneous when there is no evidence or reasonable inference from the evidence to support the findings, and we review only the evidence and reasonable inferences therefrom that are favorable to the judgment without reweighing evidence or reassessing the credibility of witnesses. *Id.* We owe no deference to a trial court, however, on matters of law, reviewing these *de novo. Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 213 (Ind.Ct.App. 2006).

Our standard of review on judgments under Trial Rule 52 differs slightly depending upon whether the entry of specific findings and conclusions comes *sua sponte* or upon motion by a party. Where a trial court enters specific findings on motion, our standard of review is as stated above. Where the trial court enters specific findings *sua sponte*, however, the specific findings control our review and the judgment only as to the issues those specific findings cover. Where there are no specific findings, a general judgment standard applies and we may affirm on any legal theory supported by the evidence adduced at trial. *Nelson*, 691 N.E.2d at 1267.

Here, Argonaut insists that the trial court failed to enter specific findings as to

whether, if Deputy Jones was using her patrol car and thus was insured under Argonaut's policy, her use of the car resulted in her injuries and eventual death. The trial court ruled on the parties' summary judgment motions on June 30, 2010 based upon the evidence designated to it by the parties. On November 17, 2010, the parties submitted their stipulation that requested the trial court to determine the outstanding issues and enter judgment without submission of the case to a jury. That stipulation requested the trial court use only the evidence already designated to it by the summary judgment motions, and we find nothing in the record indicating that any of this evidence beyond a few assertions in an affidavit was subject to objection by either party.

Having reviewed the already-submitted evidence, the trial court was then presented with the stipulation—that is, the stipulation came *after* the admission and consideration of the evidence. *Cf.* T.R. 52(A). Under these circumstances, we decline to review the judgment under the standard applicable only for specific findings and conclusions, and instead apply the rule for *sua sponte* findings and conclusions.

*Construction of Insurance Policy Terms*

 Argonaut's appeal calls upon us to review the terms of its insurance policy and UIM endorsement. Construction of insurance policies is governed by the same rules of construction as other contracts. *Buckeye State Mut. Ins. Co. v. Carfield,* 914 N.E.2d 315, 318 (Ind.Ct.App.2009), *trans. denied.*

> As with other contracts, the interpretation of an insurance policy is a question of law. When interpreting an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. We construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases or paragraphs. If the language is clear and unambiguous, we give the language its plain and ordinary meaning. An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language.

*Id.* (citations omitted). In interpreting insurance contracts we look to harmonize the provisions, rather than leave them in conflict. *Vann v. United Farm Family Mut. Ins. Co.,* 790 N.E.2d 497, 504 (Ind.Ct. App.2003), *trans. denied.*

 Generally, where the terms of a policy are ambiguous, we construe the ambiguity in favor of the insured. *Beam v. Wausau Ins. Co.,* 765 N.E.2d 524, 528 (Ind.2002). Argonaut contends that Deputy Jones is not a named insured claiming coverage under the UIM policy and that we must therefore give a neutral construction to ambiguities in the policy language where the party claiming coverage is a third party to the agreement. We have observed in a prior case that "the factor distinguishing these cases in which we apply a neutral stance ... appears to be that the party that was seeking to benefit ... was not a party to the contract." *Burkett v. Am. Family Ins. Grp.,* 737 N.E.2d 447, 452 (Ind.Ct.App.2000) (citing *Indiana Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.,* 260 Ind. 32, 291 N.E.2d 897 (1973), and *Am. Family Mutual Ins. Co. v. Nat'l Ins. Ass'n,* 577 N.E.2d 969 (Ind.Ct. App.1991) [hereinafter *American Family* ]).

A more helpful distinction, we think, lies in the observation that in cases like *Lumbermens, American Family,* and *Burkett,* the claimants to the benefits of the insurance policy were strangers to the policy-

holders entirely. In *Lumbermens,* a subrogation claim against the auto insurance policy of the employer was pursued by the homeowner's insurance company. *Lumbermens,* 260 Ind. at 33, 291 N.E.2d 897. In *American Family,* American Family sought payment on behalf of its insured from National Insurance Association, which provided insurance to the owner of a car which was driven by an automobile mechanic who was not a party to either insurance policy at the time of an accident. *American Family,* 577 N.E.2d at 971. In *Burkett,* an injured person pursued a claim against an insurance policy held by the tortfeasor's grandfather. *Burkett,* 737 N.E.2d at 449–51. So, too, in *Barga v. Indiana Farmers Mut. Ins. Grp., Inc.,* Barga pursued compensation under an insurance policy issued to the owner of a vehicle with which she was in an accident; we similarly declined to construe ambiguities in Barga's favor. 687 N.E.2d 575, 578 (Ind.Ct.App.1997), *trans. denied.*

Here, however, Deputy Jones was not a stranger to either party, but was instead an employee of the policyholder. Argonaut does not claim that Deputy Jones in her role as a Deputy Sheriff would not have been an insured under the policy generally—just that she is not covered for the claim at issue here. That is to say, Deputy Jones, though an unnamed insured, is squarely within the class of individuals whom the Argonaut policy was intended to benefit by providing liability and UIM insurance coverage. We therefore decline to apply the neutral construction principle argued for by Argonaut, though we note that our decision today would be the same in either case.

The case before us deals with the availability of UIM coverage. Thus, we consider additional public policy questions in interpreting and construing the insurance policy.

The purpose of uninsured motorists insurance is to place the insured in substantially the same position as if the other party had complied with the minimum requirements of the insurance statutes. *Whitledge v. Jordan,* 586 N.E.2d 884, 886 (Ind.Ct.App.1992), *trans. denied.* Attempts to limit or diminish the uninsured motorists protection required by statute [are] against the public policy of this state. *American States Ins. Co. v. Braden,* 625 N.E.2d 1252, 1257 (Ind. Ct.App.1993), *trans. dismissed.* However, our courts have uniformly held that public policy is not violated unless "the policy specifically limits uninsured motorist coverage as to persons who would otherwise qualify as insureds for liability purposes." *Whitledge,* 586 N.E.2d at 887. Restated, if a person qualifies as an insured under the liability section of the policy, he must also qualify under the uninsured motorists section or the insurance contract violates public policy. *Connell v. American Underwriters, Inc.,* 453 N.E.2d 1028, 1031 (Ind.Ct.App. 1983), *trans. denied.*

*Smith v. Allstate Ins. Co.,* 681 N.E.2d 220, 222 (Ind.Ct.App.1997).

### Coverage Under the UIM Endorsement

Argonaut contends that the trial court erroneously granted Jones summary judgment on the question of whether Deputy Jones was entitled to coverage under the Argonaut policy's UIM endorsement. Acknowledging this State's policy on the availability of UIM coverage when an individual would otherwise be an insured under the underlying liability policy, Argonaut argues that Deputy Jones is not an insured under the liability policy because when Myers struck her she was neither occupying her patrol car within the terms of the UIM endorsement nor using her patrol car within the terms of the liability

policy, and thus was not insured. In his reply brief, Jones argues that Deputy Jones was entitled to direct coverage under the UIM endorsement because she was occupying the patrol car pursuant to the terms of the endorsement, and offers counterarguments for each of Argonaut's other points. We address each contention in turn.

### Whether Deputy Jones was Occupying the Patrol Car

Argonaut argues that Deputy Jones did not occupy the patrol car within the provisions of the UIM endorsement. Argonaut concedes, however, that where an individual would be considered an insured under the terms of the liability policy underlying the UIM endorsement, UIM coverage and policy limits apply even where there is no coverage directly under the terms of a UIM endorsement. *See Smith*, 681 N.E.2d at 222. Moreover, it was on this basis, not an interpretation of the UIM endorsement's terms, that the trial court entered judgment for Deputy Jones. Thus, we do not rule on this matter. Instead, we turn to the issue of whether UIM coverage was available to Deputy Jones as an insured under the liability portion of the policy.

### Whether Deputy Jones Was Using the Patrol Car Within the Terms of the Policy

Argonaut contends that the trial court improperly granted summary judgment because Deputy Jones was not, as a matter of law, using her patrol car within the terms of the liability policy, and thus she was not covered under the liability policy. Because she lacked such coverage as an insured under the liability policy, Argonaut

contends, Deputy Jones in turn is not entitled to coverage under the UIM endorsement.

The provision of the insurance policy at issue states:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

(Appellant's App. 94.) An "insured" is defined as "You," that is, the Monroe County Board of Commissioners, or "[a]nyone else while using with your permission a covered 'auto' you own, hire, or borrow," (Appellant's App. 94), excepting from the definition of "insured" individuals operating a vehicle in situations not applicable here.

The term "use" goes undefined in the policy.[4] We thus apply the term according to principles of contract and insurance construction, which require that words be given their plain and ordinary meaning while construing the insurance policy as a whole. *Burkett*, 737 N.E.2d at 456. We think that Deputy Jones's deployment of her patrol car for the purposes of traffic control and accident site safety, which included the placement of the vehicle in a lane of travel with its emergency lights activated, fell within the plain and ordinary meaning of the term "use" as it appears in the Argonaut liability policy.

Both this court and our supreme court have considered cases involving the proper interpretation of "use" in insurance policies similar to Argonaut's. Our supreme court considered policy language similar to

---

4. "Resulting from" also goes undefined. At summary judgment, the trial court found a question of material fact on whether Deputy Jones's injuries resulted from use of her police car and determined that issue upon entry of the Declaratory Judgment Order. We therefore discuss the use of the phrase "resulting from" in our review of the Declaratory Judgment Order, below.

that at issue here in *Lumbermens.* In that case, the insurance policy on a delivery truck included policy language covering injuries "arising out of the ownership, maintenance or use" of the truck for delivery purposes. *Lumbermens,* 260 Ind. at 34, 291 N.E.2d 897. An employee of a company that sold and installed water softeners, Jack Walker, was bringing a water softener down basement stairs in a residence when the stairs collapsed and he was injured. Lumbermens, which insured the homeowners, settled with Walker and sought compensation from Statesman, which provided insurance on the delivery truck. Specifically, Lumbermens claimed that Walker was injured while loading or unloading the truck, which activity was covered under the truck's liability policy. *Id.* at 33, 291 N.E.2d 897.

Our supreme court disagreed with Lumbermens, holding that the cause of Walker's injuries was not his use of the truck in unloading the water softener, but the collapse of the basement stairs. Because Walker was not in the process of loading or unloading the truck, but rather was in the home and on the basement stairs when he was injured, use of the truck did not cause the injury. The court thus held that use of the truck was not the "efficient and predominating cause" of Walker's injuries, *id.* at 34, 291 N.E.2d 897—and Statesman's policy afforded no coverage in that situation.

Interpreting *Lumbermens,* this court has differentiated between use and causation, focused on the purpose to which a subject vehicle is put and the intent of the parties to the insurance agreement when considering whether a claimant's actions were covered by the term "use." Thus, we have held that a tow-truck operator was using his truck within the term "use" when he was struck by a motorist upon exiting a police vehicle in preparation to tow a semi-trailer. *Monroe Guar. Ins. Co. v. Campos,* 582 N.E.2d 865 (Ind.Ct.App.1991), *trans. denied.* In *Campos,* we focused closely upon the types of activities that a tow-truck operator could reasonably be expected to engage in and whether Campos's actions on the day he was injured came within that scope of coverage. Though not physically present alongside the vehicle, we held that Campos was nevertheless using the vehicle within the provisions of an insurance policy because he was engaged in activities that "the parties [to the policy] certainly would have contemplated." *Id.* at 870.

Similarly, looking to the purpose and equipment of a vehicle, we have held that pulling an idling bus in neutral gear during a bus-pulling contest does constitute use, noting that a "bus is designed to be braked and steered," which characteristics were essential to operation of the bus and were why the bus was used for the contest. *Franz v. State Farm Fire & Cas. Co.,* 754 N.E.2d 978, 981 (Ind.Ct.App.2001), *trans. denied.* However, we have held that there is no coverage under an automobile insurance policy where an individual in one car fired a handgun at the plaintiff-occupants of another car, because while the shooter was using the car to get to the scene, the car was a "mere situs" for the injuries inflicted with which the injured parties had no relationship. *Moons v. Keith,* 758 N.E.2d 960, 964 (Ind.Ct.App.2001), *trans. denied; also State Farm Mut. Auto. Ins. Co. v. Spotten,* 610 N.E.2d 299 (Ind.Ct. App.1993), *trans. denied.* Similarly, we have held that where an individual was injured when pulled from a vehicle's hood and onto the ground, those injuries did not arise from use of the pulled-over, unoccupied vehicle. *Shelter Mut. Ins. Co. v. Barron,* 615 N.E.2d 503, 506 (Ind.Ct.App. 1993), *trans. denied.* We have also held that no use occurred where an individual who had obtained automotive insurance for

his own vehicle was a passenger in another person's vehicle, but was not using that vehicle as a driver or operator. *Estate of Sullivan v. Allstate Ins. Co.*, 841 N.E.2d 1220 (Ind.Ct.App.2006).

 Thus, whether there is an "active" relationship between the claimant and the vehicle, *id.* at 1224 (citing *Miller v. Loman*, 518 N.E.2d 486 (Ind.Ct.App.1987)), and the reasonable expectations of the parties upon entering into the insurance agreement are the crucial questions to answer in determining coverage issues. We hold that the trial court correctly concluded that there was no question of material fact and that Jones was entitled to judgment as a matter of law on whether Deputy Jones was using her patrol car.

The evidence Jones designated in support of his motion for summary judgment can give rise to no inference other than that Deputy Jones had deployed her police vehicle to assist her in directing traffic and securing the scene of the truck slide-off. Evidence derived from Trooper Fitzgerald, Sims, and Chief Pitcher all establish that Deputy Jones used the vehicle in a manner contemplated by the parties. Sims testified that he was relying upon Deputy Jones's use of her patrol car to provide traffic control and security, asking her to reposition her car to help block first the southwest-bound lane of State Road 45, and then the entire road so he could tow the pickup truck out of the ravine. Chief Pitcher and Trooper Fitzgerald both indicated that Deputy Jones's activation of emergency lights and placement of her patrol car in the southwest-bound lane on State Road 45 was performed in a manner consistent with use of the patrol car for

traffic control and protection of an accident scene. Trooper Fitzgerald testified that the car and its specialized equipment were a "vital part of the scene" (Appellant's App. 299), and Chief Pitcher stated that the car and its safety equipment were "integral" to the scene and Deputy Jones's role in traffic control and accident scene protection. (Appellant's App. 356.)

Argonaut designated no evidence that indicates that Deputy Jones's actions with relation to her patrol car were inconsistent with using the car for controlling traffic around the slide-off site or were anything other than central to that purpose. Rather, Argonaut focuses on Deputy Jones's distance from the patrol car, the positioning of the car, the length of time Deputy Jones spent directing traffic away from the car, and Myers's contentions that she did not see the patrol car's lights on or see a reason for a police car to be deployed at all.

Whether Deputy Jones was 104 feet from her patrol car, as determined by Trooper Fitzgerald's measurements, or some shorter distance, per Sims's testimony, the question is not one of distance alone, but whether Deputy Jones was in some active relationship to the vehicle at the time of the collision. Nor is time the crucial inquiry. Whether Deputy Jones spent five minutes or fifteen minutes directing traffic is not dispositive, so long as she was still in some active relationship to the car. *See Miller*, 518 N.E.2d at 491 (rejecting a test focusing only on distance and time when considering whether an individual was "alighting" from a vehicle and noting that "other relevant criteria" may be considered).[5]

---

**5.** Those factors, which this court indicated would be afforded different weight in different circumstances, include the distance between accident and automobile, the time between leaving the vehicle and the accident,

the injured person's opportunity to reach a zone of safety, and the injured person's intentions in relation to the automobile. *Miller*, 518 N.E.2d at 491–92.

As to the position of Deputy Jones's patrol car, Argonaut makes much of Myers's testimony that it was "possible" that Sims's tow truck blocked her view of the squad car and its emergency lights. Yet whether Myers did not recall seeing the patrol car or any other vehicle is not relevant to whether Deputy Jones maintained an active relationship to the car and its safety equipment as part of her work at the scene; nor is Myers's opinion that there was no purpose she saw for a patrol car to be present. Trooper Fitzgerald's testimony, accident reconstruction diagrams and measurements, and photographic evidence established that Deputy Jones's car was not parked directly behind Sims's tow truck, but rather was offset to the left by several feet. Trooper Fitzgerald agreed that Deputy Jones's car was within the southwest-bound traffic lane.

Having evaluated much of this evidence, both Trooper Fitzgerald and Chief Pitcher concluded that Deputy Jones had properly positioned her car to provide traffic control and accident scene protection. Argonaut presented no evidence to the contrary, and any question as to the position of Deputy Jones's vehicle within the southwest-bound lane was resolved by the photographs of the accident scene and Trooper Fitzgerald's indication that the diagram upon which Argonaut relies to attempt to raise a question of fact is likely in error, an assertion borne out by examination of the photographs. Given the evidence and proper inferences drawn from it, there is no factual or legal question that Deputy Jones had an active relationship to the patrol car, and that the car was central to her role in controlling traffic at the scene. In other words, the car was in "use."

Moreover, Deputy Jones's relationship to her patrol car when Myers collided with her was clearly within the contemplation of the parties to the policy—the Monroe County Board of Commissioners and Argonaut. Argonaut agreed to insure a government body that employs law enforcement officers who are regularly called upon to control traffic and assist in the resolution of automobile accidents. Use of these vehicles is common—indeed, expected—and part of the training of law enforcement officers. The insurance policy included an inventory of the vehicles covered, and the inventory expressly noted many of these to be Sheriff's Department vehicles. As in *Campos*, where Campos's movement between a police car and his tow truck were within the reasonable scope of his work as a tow-truck operator, *Campos*, 582 N.E.2d at 870, here the reasonable scope of covered uses of Deputy Jones's patrol car necessarily includes its deployment and use in traffic control situations like the one at issue.

Given the nature of the use the parties to the agreement should reasonably have expected, Deputy Jones's activities directing traffic while her patrol car was blocking one of two lanes with its lights activated constituted use of her patrol car within the terms of Argonaut's policy. The trial court therefore properly granted summary judgment to Jones on the issue of use under Argonaut's policy and properly denied summary judgment to Argonaut on this same issue.

*Whether Deputy Jones's Injuries and Death while Using the Patrol Car for Traffic Control was within the Reasonable Expectations of the Parties to the Insurance Policy*

Argonaut further contends that, even if Deputy Jones was using the patrol car, her injuries and death did not occur as a result of that use, and thus the liability provisions of the policy do not apply to allow her a recovery. Argonaut directs us in particular to the requirement that an insured's injuries be "caused by an 'acci-

dent' and resulting from ... use of a covered 'auto.'" (Appellant's App. 94.) The phrase, "resulting from," goes undefined. Thus, we are again required to interpret the policy to determine whether the manner in which Deputy Jones was injured and killed while using her patrol car falls within the reasonable expectations of the parties to the Argonaut policy.

Argonaut contends that the policy calls for coverage only when use of an insured vehicle is a proximate cause of the insured's injuries, pointing to, among other cases, *Lumbermens*. In *Lumbermens*, the activity in which the injured individual was engaged—bringing a water softener down basement stairs—was not within the scope of activities contemplated by the parties to the insurance policy as a potentially covered injury because loading or unloading the truck was not the "efficient and predominating cause" of the injuries, *Lumbermens*, 260 Ind. at 34, 291 N.E.2d 897, running counter to Lumbermen's contention that "by cooperating in the unloading process the homeowners became 'users' and therefore insureds" under the truck's policy. *Id.* at 33, 291 N.E.2d 897.

Yet the facts here differ, and our search of case law has revealed no case in which this court or our supreme court considered the precise phrase, "resulting from," used in the Argonaut policy. The courts of our sister States and some federal courts, however, have considered such language, and have reached different conclusions. *Compare Spencer v. Liberty Mut. Ins. Corp.*, 381 F.Supp.2d 811, 816–17 (S.D.Ind.2005) (applying *Campos, supra*, and holding that injuries incurred by a semi-tractor driver who provided aid to a motorist under Florida's "stop-and-assist" statute were within the contemplation of the parties to the insurance agreement), *and Tobel v. Travelers Ins. Co.*, 195 Ariz. 363, 988 P.2d 148 (Ariz.Ct.App.1999) (citing *McMichael, in-*

*fra*, and distinguishing between causation from use of an ordinary passenger vehicle when compared to "a specialized vehicle," here, a flatbed truck with emergency lights and strobes), *and Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 104 (Colo. 1995) (holding injuries suffered were within the reasonable expectations of the parties to the insurance agreement where a road worker was injured after he activated safety lights on his truck and relied upon it as a safety barrier while working), *with Ins. Co. of N. Am. v. Perry*, 204 Va. 833, 134 S.E.2d 418 (1964) (finding no coverage where a police officer used a car as transportation in order to serve a warrant and was struck by an uninsured driver while doing so, rather than while using the vehicle), *and Edwards v. Government Employees Ins. Co.*, 256 Va. 128, 500 S.E.2d 819 (1998) (distinguishing *Perry* and another case because Edwards was "engaged in a transaction essential to the vehicle's use at the time of the accident"). After our review of case law, we think that the cases holding in favor of coverage are better reasoned, and we think *McMichael* particularly illustrative.

In *McMichael*, the Colorado Supreme Court considered whether a UIM policy covered injuries suffered by a utility worker who was struck by a motorist while using his truck for protection from passing traffic, where "the truck was specially equipped with protective gear and warning devices and positioned to provide a barrier." *McMichael*, 906 P.2d at 104. Distinguishing McMichael's claim from cases in which a vehicle was "merely the situs" for an accident, *id.*, the Colorado court held that McMichael's injuries "arose out of his use of the truck as a barricade and warning device" because he "was aware of the dangers posed to roadway workers by passing cars" and thus "did not begin work or enter the roadway area until he had positioned the truck to serve as a warning

of his presence." *Id.* McMichael's reliance on the warning devices thus made the truck "an integral part of his work on the roadway" and thus "causally related to the ensuing accident," a fact not changed by the fault of the driver who struck him or the failure of the truck to protect him. *Id.*

As in *McMichael,* there can be no question here that the reasonable expectations of the Board of Commissioners and Argonaut would necessarily include the use of specialized and specially equipped patrol cars for traffic control and accident site safety. Where such vehicles are then put to that use, where the individual is using the vehicle with consent of the owner for those specialized purposes and has an active relationship to the vehicle as deployed and the individual is injured in a manner that may reasonably arise from traffic control and accident site safety activities, we hold that that such an injury results from the use and is thus covered under the UIM and liability policy language presented to us today.

In light of this holding above, we now examine the trial court's findings and conclusions in its Declaratory Judgment Order. The trial court concluded that Deputy Jones's injuries resulted from her use of the vehicle: "Sarah Jones' injuries and death resulted from her use of the Monroe County Sheriff's car, while she was engaged in the duties of directing traffic in State Road 45 on October 17, 2008." (Appellant's App. 30.) Argonaut does not challenge the trial court's factual findings, but rather contends that it erred as a matter of law when it concluded that Deputy Jones's injuries and death resulted from her use of her patrol car.

We disagree, and find no error. The trial court found that Deputy Jones placed her patrol car in the southwest-bound lane of State Road 45, with its emergency lights on and engine running, with only a small portion of the fender of the vehicle protruding over the fog line. With the lights activated, traffic began to line up behind Deputy Jones's car as she directed traffic, making use of her patrol car as a means to stop the flow of southwest-bound traffic. She used her patrol car for one of its intended purposes, and this use was within the reasonable expectations of the Board of Commissioners and Argonaut. Her use of the vehicle was integral to her work directing traffic safely around the accident site so that Sims could tow the pickup truck out of the ravine on the side of the road. Having put the specialized equipment to use in such a manner, Myers struck Deputy Jones while Deputy Jones was directing traffic—that is, while Deputy Jones used her patrol car for a reasonably expected purpose. As in *McMichael,* the fact that Deputy Jones's car did not accomplish its protective purpose is immaterial to the question of whether her injuries and death resulted from her use of the patrol car and the specialized safety equipment on it. *Cf. McMichael,* 906 P.2d at 104.

Argonaut contends that our conclusion today "would cause Argonaut to become an insurer for every sort of accident or injury incurred by a police officer who is injured while on duty." (Appellant's Br. 22.) We do not agree. Here, Deputy Jones was actively using her vehicle to control traffic around an accident scene in addition to her use of hand signals and a flashlight. Her patrol car was an integral part of her work to secure the scene and permit Sims to tow the pickup truck that had run off the roadway. This is not at all like a situation where a police officer leaves a police car for an extended period of time to perform police activities for which the car itself is not essential, and as noted above, our sister States have held as much. *See, e.g., Perry, supra.*

Under these circumstances, we hold that the trial court did not err when it concluded that Deputy Jones's injuries and death resulted from her use of the police car.

### Applicability of the Course of Employment Exclusion

 Argonaut goes on to argue that, even if Deputy Jones was otherwise entitled to coverage under the UIM endorsement and the liability terms of the insurance policy, Deputy Jones was engaged in conduct within the course of her employment. Argonaut directs our attention to a provision that excludes coverage under its insurance policy. Based upon this provision, Argonaut insists that because Deputy Jones was directing traffic and was thus engaged in conduct within her employment, she is not entitled to coverage under its policy for automobile insurance.[6]

 Thus, Argonaut raises for our review the applicability of an exclusion in its insurance policy.

> Generally, insurers are free to limit liability in any manner not inconsistent with public policy, and an unambiguous exclusionary clause is ordinarily entitled to enforcement. *Erie Ins. Co. v. Adams*, 674 N.E.2d 1039, 1041 (Ind.Ct. App.1997), *trans. denied.* However, exceptions, limitations and exclusions must be plainly expressed in the policy. *Id.* The exclusionary clause must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into play, and any doubts to the coverage under the policy shall be construed against the insurer to

further the policy's basic purpose of indemnity. *Id.; see also* [*USA Life One Ins. Co. v.*] *Nuckolls*, 682 N.E.2d [534] at 538 [ (Ind.1997) ]. This strict construction against the insurer is "driven by the fact that the insurer drafts the policy and foists its terms upon the customer." *Stevenson* [*v. Hamilton Mut. Ins. Co.*], 672 N.E.2d [467] at 471 [ (Ind.App.1996) ] (citation omitted).

*Am. Family Life Assur. Co. v. Russell*, 700 N.E.2d 1174, 1177 (Ind.Ct.App.1998), *trans. denied.* "Even where clauses are unambiguous when read within the policy as a whole, but in effect provide only illusory coverage, the policy will be enforced to satisfy the reasonable expectations of the insured." *McGuire v. Century Sur. Co.*, 861 N.E.2d 357, 363 (Ind.Ct.App.2007) (quoting *Great Lakes Chem. Corp. v. Int'l Surplus Lines Ins. Co.*, 638 N.E.2d 847, 850 (Ind.Ct.App.1994)).

> The policy exclusion at issue here states: This insurance does not apply to any of the following:
>
> \* \* \*
>
> "Bodily injury" to:
> a. An "employee" of the "insured" arising out of and in the course of:
> > (1) Employment by the "insured"; or
> > (2) Performing the duties related to the conduct of the "insured's" business
>
> \* \* \*
>
> This exclusion applies:
> > (1) Whether the "insured" may be liable as an employer or in any other capacity; and

---

**6.** We note that Argonaut advances this argument with citation to the record but without citation to legal authority of any kind, and similarly does so when arguing that proximate cause is the applicable legal standard for interpreting other facets of the insurance policy here. We remind counsel that the rules of this court require arguments to cite applicable authorities. Ind. Appellate Rule 46(A)(8)(a) (providing that "[e]ach contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record"). Bald statements about the requirements of the law, without more, do not comport with this rule.

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

(Appellant's App. 95.)

■ Our search of Indiana case law reveals no case directly on-point with Argonaut's claim that the employment exclusion precludes Deputy Jones from coverage under the liability portion of the policy, and accordingly would also preclude her coverage under the UIM provisions. Numerous of our sister States have held such provisions valid within the context of automotive financial responsibility laws, while others have not. Notably, many cases holding such provisions valid have dealt with suits by employees against their employers or co-employees where worker's compensation benefits were available for torts allegedly committed by employers. *See, e.g., Canal Ins. Co. v. Nix*, 7 P.3d 1038 (Colo.App.1999) (holding provision unambiguous and not invalid in light of State public policy regarding No–Fault Act and Federal interstate motor carrier statute where employee sued employer and co-employee); *State Farm Mut. Auto. Ins. Co. v. Roe*, 226 Mich.App. 258, 573 N.W.2d 628 (1997) (holding provision valid in light of provisions in Michigan worker's compensation act and automobile insurance statutes where plaintiff alleged negligence of employer led to accident and injury); *State Farm Mut. Auto. Ins. Co. v. N. River Ins. Co.*, 288 S.C. 374, 342 S.E.2d 627 (S.C.Ct.App.1986) (holding that, where statutory provisions permitted employment exclusion, exclusion was valid where employee's estate sued employer and employer's insurance carrier).

Our established principles for interpreting insurance exclusions under the present circumstances guide us to a different result. Argonaut does not contend that it was unaware that it was issuing automobile insurance for an employer of, among others, law enforcement officers for whom use of a patrol car is an integral aspect of their work. It instead insists that Deputy Jones's activities directing traffic on October 17, 2008, were squarely within the scope of her employment as a law enforcement officer, and thus fall within the employment exclusion.

Though we agree with Argonaut that the employment exclusion provision is unambiguous, we nevertheless hold that, in this case, it does not apply based upon the reasonable expectations of the insured. The use of vehicles—patrol cars, motorcycles, and transport vans, among others—is integral to the work performed by police officers, as it was to Deputy Jones's work. It is hard to see how any use of a police vehicle—indeed, any municipally-owned vehicle under the policy—could be covered under the liability policy and UIM endorsement if Deputy Jones's use of her vehicle is not covered. And we cannot see how an insurer would write an insurance policy for a municipality, accept premium payments for the policy, and have a reasonable expectation that a course-of-employment exclusion like that presented here would result in anything other than an illusory policy.

Moreover, unlike the cases from our sister States above, Deputy Jones has not alleged that her employer—the Board of Commissioners, through the Sheriff's Department—is in any way liable for her injuries. Instead, Deputy Jones seeks coverage under the UIM endorsement purchased by the Board of Commissioners to insure its losses and those of its employees in the face of the risk of loss and injuries inflicted by uninsured or underinsured drivers. This seems to us squarely within the risks contemplated by the parties and purpose for UIM endorsements;

to rule otherwise is to render the UIM endorsement illusory for any occasion where a Board employee is engaged in any use of a covered vehicle within their employment duties.

We thus conclude that Argonaut's interpretation of the exclusion of coverage for injuries incurred in the course of employment under an insurance policy issued to an employer, where the work done directly involves and requires use of the insured's automobiles, renders the provisions of the insurance policy essentially illusory. This is especially so where, as here, Jones seeks recovery not against Deputy Jones's employer but under the aegis of the UIM endorsement, the protection of which it is against public policy to diminish. Thus, we cannot agree with Argonaut that the employment exclusion operates here to preclude Deputy Jones's claim for coverage under the UIM endorsement.

### Conclusion

The trial court did not err when it granted summary judgment to Jones on the question of whether Deputy Jones was using her patrol car when Myers struck her, because Deputy Jones maintained an active relationship to the patrol car in her work at the accident scene, regardless of the amount of time she was away or her distance from the car, and that active relationship was within the reasonable expectations of the parties. The trial court also did not err when it concluded in its Declaratory Judgment Order that Deputy Jones's injuries and death resulted from her use of the patrol car, as such use and resultant injury were within the reasonable expectations of the Board of Commissioners and Argonaut when they entered into the insurance agreement. Finally, we conclude that the employment exception does not apply in this case, as application here is contrary to the reasonable expectations of the parties and would create an essentially illusory policy of insurance in contravention of this State's established public policies favoring coverage.

Affirmed.

FRIEDLANDER, J., and BROWN, J., concur.